**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | |
|---|---|
| **TARGETED JUSTICE, INC**.; <br> a 501(c)(3) Texas Corporation, <br><br> **DR. LEONID BER;** <br><br> **DR. TIMOTHY SHELLEY;** <br><br> **KAREN STEWART;** <br><br> **WINTER CALVERT;** <br><br> **ARMANDO DELATORRE,** <br> **JASMIN DELATORRE,** <br> **J. D,** a minor**;** <br><br> **DEBORAH MAHANGER,** <br> **L. M.** a minor**;** <br><br> **LINDSAY J. PENN;** <br><br> **MELODY ANN HOPSON;** <br><br> **ANA ROBERTSON MILLER;** <br><br> **YVONNE MENDEZ;** <br><br> **DEVIN DELAINEY FRALEY**; <br><br> **SUSAN OLSEN;** <br><br> **JIN KANG;** <br>         and <br><br> **JASON FOUST;** <br>         Plaintiffs, <br><br> vs. <br><br> **MERRICK GARLAND**, in his official capacity as <br> Attorney General of the United States, <br> Department of Justice <br> 950 Pennsylvania Avenue, NW <br> Washington, DC 20530; | FIRST AMENDED COMPLAINT <br> WRIT OF MANDAMUS <br> COMPLAINT FOR DECLARATORY <br> AND INJUNCTIVE RELIEF; DAMAGES; <br><br><br><br><br><br><br><br><br><br> Case No. <br> Jury Trial Demand |

1

**FEDERAL BUREAU OF INVESTIGATION**,
935 Pennsylvania Avenue NW
Washington, DC 20535;

**CHRISTOPHER WRAY**, in his official capacity
as Director of Federal Bureau of Investigations and
in his personal capacity;

**CHARLES KABLE, JR,** in his official capacity as
Director of the Federal Bureau of Investigation's
Terrorist Screening Center and in his personal
capacity;

**DEPARTMENT OF HOMELAND SECURITY**,
245 Murray Lane, SW
Washington, DC 20528-0075;

**ALEJANDRO MAYORKAS**, in his official
capacity as Secretary of the Department of
Homeland Security and in his personal capacity;

and

**KENNETH L. WAINSTEIN**, in his official
capacity as Department of Homeland Security's
Under Secretary for Intelligence and Analysis
and in his personal capacity.

Defendants.

## AMENDED WRIT OF MANDAMUS, COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

TO THE HONORABLE COURT:

NOW COME the Plaintiffs, Targeted Justice, Inc., Leonid Ber, Timothy Shelley, Karen Stewart, Winter Calvert, Armando Delatorre, Berta Jasmin Delatorre, for themselves and on behalf of their minor daughter J. D., Deborah Mahanger, on her own behalf and on behalf of her minor daughter L. M., Lindsay J. Penn, Ana Robertson Miller, Melody A. Hopson, Devin Delainey Fraley, Yvonne Mendez, Susan Olson, Jin Kang, and Jason Foust through their undersigned counsel, and respectfully allege and pray:

2

### I. INTRODUCTION

1.      Under the guise of "national security", for decades the agencies of the United States government have subjected unsuspecting American citizens to cruel, illegal, covert human experimentation.

2.      Executive Order 13526 provides that "in no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to conceal violations of law, inefficiency, or administrative error."

3.      From 1953 to 1966, the Central Intelligence Administration (CIA) sponsored the MK-ULTRA program to control human behavior. <u>CIA v. Sims</u>, 471 U.S. 159 (1985). The program's stated purpose was that of developing brainwashing and interrogation techniques. *Orlikow v. United States,* 682 F. Supp. 77 (D.D.C. 1988). Unsuspecting subjects underwent long-lasting, cruel experimentation without their knowledge or consent.

4.      During 1975-76, Congress carried out an investigation of the MK-ULTRA program. The "Church Committee" under the direction of the late Senator Frank Church held hearings that resulted in the apparent shut down of the program.

5.      Upon concluding his investigation, Senator Church tried to rein in the corrupted intelligence agencies when he publicly warned everyone that:

> *"The National Security Agency's capability at any time could be turned around on the American people, and no American would have any privacy left, such is the capability to monitor everything: telephone conversations, telegrams, it doesn't matter. There would be no place to hide. If a dictator ever took over, the N.S.A. could enable it to impose total tyranny, and there would be no way to fight back."*

6.      Likewise, the COINTELPRO program that started in the thirties was designed to crush political opposition through the use of illegal surveillance and persecution tactics. In

3

Puerto Rico its effects were particularly devastating as the program known as "*Las Carpetas'* was "*used to imprison people, ruin their careers, fire them from their jobs, terminate their education, and permanently discredit them..It was used to control the politics and society of Puerto Rico: through fear, intimidation and outright blackmail.*"[1]

7.      In the year 2000, speaking about the COINTELPRO and *Las Carpetas,* Defendant FBI Director Louis J. Freeh admitted in a House Appropriations subcommittee hearing that: "(T)he FBI did operate a program that did tremendous destruction to many people, to the country and certainly to the FBI." Freeh then vowed to "redress some of the egregious illegal action, maybe criminal action that occurred in the past."

8.      Presently Defendants jointly collaborate with another illegal covert human experimentation and persecution program: a hybrid behemoth that combines MK ULTRA and COINTELPRO's "*Las Carpetas*". Labeled with the nondescript moniker of  "The Program", its global scope aims to control and destroy opposition. Hundreds of thousands of American citizens and lawful U.S residents such as Plaintiffs are subjects of this "Program" funded with billions of American taxpayer money.

9.      On April 26, 2011, for0mer FBI Senior Special Agent-in-Charge Ted Gunderson stated in an affidavit under penalty of perjury that thousands of innocent victims have been targeted by an illegal government ongoing, active, nationwide rogue criminal enterprise that is active 24 hours a day within the U.S. whose increase in scope, intensity and sophistication was made possible by the new communications and surveillance technologies. See **Exhibit 1.** Plaintiffs request that this court take judicial notice of this statement, filed within the case Labella v. Fed. Bureau of Investigation, 11-CV-0023 (NGG) (LB) (E.D.N.Y. Mar. 16, 2012).

---

[1]      See The War Against PuertoRicans, https://waragainstallpuertoricans.com/carpetas/

10.     Individuals in this nefarious program are referred to as "Targets". "They are subjected to illegal and unconstitutional phone taps, illegal re-routing of business and private phone calls for harassment purposes, surreptitious entry into home, office and vehicle, virtual surveillance in the home conducted by illegal placement of miniature remote, wireless cameras (often accessible through the internet), illegal internet spyware, illegal GPS tracking (often through their own mobile phones), regular fixed and mobile surveillance, mail misdirection, mail theft and tampering, financial and employment sabotage, slander campaigns, poisoning, assaults and murder, illegal set-ups on drug charges and other felony charges, amongst [sic] many other civil rights abuses." *Id.*

11.     Technological advances have been incorporated into the illegal organized stalking and surveillance, including the use of microwave weapons for inflicting physical and psychological torture that ends up causing them the condition known as Havana Syndrome, Remote Neural Monitoring and Voice-to-Skull Auditory Symptoms.

12.     For decades, an impenetrable wall of "plausible deniability" camouflaged perpetrators' crimes against Targets. The program's sophistication prevented victims from identifying with clarity the abuses and tortures perpetrated against them and also from articulating the mechanisms by which these abuses and tortures were being deployed and executed. Any Target who identified or attempted to report the abuses and torture was accused of being mentally ill. Rather than commencing investigations into these serious crimes and prosecuting the perpetrators for their criminal conduct, federal, state and tribal law enforcement agencies colluded to institutionalize its victims and declare them mentally ill or incompetent.

13.     Plaintiffs' and 450 TJ Members' substantially similar accounts counteract the program's cornerstone "plausible deniability" that allowed its unchecked operation for decades.

5

14.     The Targeted Individual program obtains its experimental subject roster from unconstitutional subcategories of the Terrorist Screening Database (TSDB) that contains the names of people who have no ties to terrorism. In the exercise of their discretion, Defendants Wray and Kable Jr. decide the fate of unsuspecting individuals such as Plaintiffs, condemning them to a life of premeditated torture.

15.     Former Terrorist Screening Center ("TSC") Deputy Director Timothy Groh admitted that the TSDB contains names of people who have no ties to terrorism. In a Statement given under Penalty of Perjury Mr. Groh expressed that the TSDB contains information of individuals who constitute "**<u>an exception</u>**" to the **"reasonable suspicion standard"** "who are **not considered 'known or suspected terrorists'"** and "<u>**are not screened as such**</u>". (See **Exhibit 2** - Emphasis ours).[2]

16.     Groh's specific words were the following:

3 Additionally, the TSDB includes identifying information of certain individuals who are not categorized as known or suspected terrorists. These limited exceptions are more fully described in FN 7.

7 Limited exceptions to the reasonable suspicion standard exist for the sole purpose of supporting certain special screening functions of DHS and State (such as determining eligibility for immigration to the U.S.). Individuals included in the TSDB pursuant to such exceptions are not considered "known or suspected terrorists" and are not screened as such. As a result, any U.S. person who is in the TSDB pursuant to an exception to the reasonable suspicion standard would not be required to undergo heightened aviation security screening at airports on that basis (but could be selected for other unrelated reasons, such as random selection).

Pursuant to Fed.R.Evid. 201(c)(2) and (d), Plaintiffs request that this Court take judicial notice of the adjudicative facts contained in **Exhibit 2,** including the statements set forth above.

17.     The TSDB's subcategory of individuals who are not "known or suspected

---

[2]     Please see Timothy P. Groh's Statement Under Penalty of Perjury dated March 19, 2019 submitted in case <u>ElHady v. Kable</u>, 391 F.Supp.3d 562 (E.D.VA 2019),

terrorists" is also known as "Non-Investigative Subjects ("NIS") and are listed under "Handling Codes 3 and 4".  The consortium of governmental agencies acting under the guise of "national security" have secretly, unconstitutionally and maliciously sentenced each NIS to undergo a lifetime of covert human experimentation that targets and tortures these human beings in many instances to their death.

18.     Without sufficient grounds to link an individual to terrorism, an unwitting person's placement on the TSDB's NIS/Handling Codes 3 / 4 lists is the equivalent of being indicted, tried and sentenced to a lifetime of torture and physical and psychological abuse in violation of this country's constitutional prohibition against cruel and unusual punishment.

19.     Defendants' unrestricted inclusion of NIS in the TSDB has resulted in huge swaths of the population that have nothing to do with terrorist activity included in an atrocious experiment without their consent and against their will. Consequently, an unprecedented number of people such as Plaintiffs have emerged to publicly expose their experiences enduring these criminal attacks that go unstopped and unpunished.  The cloak of invisibility that for decades shielded the program from exposure no longer exists.

20.     Stated another way:  the TSC includes American citizens and legal residents that are not known or suspected terrorists in its terrorist database under the purview of Defendants Wray and Kable Jr. for no purpose other than secretly enlisting them in an involuntary human experimentation program that targets unsuspecting victims, divesting them of their autonomy and destroying their lives, with no recourse.

21.     Plaintiffs and TJ Members are victims and survivors of these crimes against humanity and the deprivation of their fundamental constitutional, civil and human rights. Plaintiffs come before this Court to petition for the redress of their grievances and protection

from these shocking abuses; to request that this Court declare unconstitutional the NIS/Handling Codes 3 / 4 subcategories of the TSDB and/or to direct that their names be removed from it; and to hold Defendants jointly and severally liable for the damages they've sustained as a result of the outrageously vicious, illegal, and unconstitutional tortures and constitutional violations they have endured as targeted individuals.

## II. JURISDICTION AND VENUE

22.     The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution, laws and treatises of the United States of America; 28 USC 1346(a)(2) because it includes claims against  agencies of the United States; Article III Section 2 of the United States Constitution because the rights sought to be protected herein are secured by the United States Constitution; the Mandamus Act, 28 U.S.C § 1361; the Court's equitable jurisdiction to issue an Injunction to compel an officer or employee of the above-named federal agencies to perform his or her duty under 28 U.S.C. § 1361; and the United Nations' Convention 1753 against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, ratified by the United States of America in 1994 ("Convention Against Torture").

23.     The Court has authority to grant Declaratory and Injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; Rules 57 and 65 of the Federal Rules of Civil Procedure; the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; the Privacy Act, 5 USC § 552(a)(4)(B); and 28 U.S.C. § 1361.

24.     The Court has authority to award costs and attorneys' fees against Defendants under 28 U.S.C. § 2412 and 5 USC § 552(a)(4)(E)(i) since this action is brought against officials of the United States acting in their official capacity as well as agencies of the United States.

25.     This court also has jurisdiction to award damages pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1357 and  Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), et seq. and Plaintiffs' civil rights arising from the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments as well as the Convention Against Torture.

26.     Prior to the filing of this complaint, Plaintiffs served on all Defendants a demand letter with the intent that it should take the immediate compulsory actions contained therein. See **Exhibit 3**.

27.     Prior to the filing of this complaint, the named individual Plaintiffs sent Defendants Privacy Act requests under 5 U.S.C. § 552(a) as specified in paragraph  56  below, incorporated by reference herein.

28.     Defendants' failure to provide each individual Plaintiff an adequate reply under the Privacy Act compelled the filing of this complaint.

29.     Venue is proper under 28 U.S.C. § 1391(b)(2) and (e)(1)(B) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred within the Southern District of Texas.

### III. THE PARTIES

<u>Plaintiffs</u>

30.     Targeted Justice, Inc. ("TJ") is a 26 USC § 501(c)(3) non-profit, non-partisan Texas corporation, that represents the interests of Targeted Individuals (TIs). TJ's mission is to educate the public with information, news, and support for TI's to help them navigate through the trauma and destruction that this phenomenon produces in their lives. TJ's goal is that of stopping the illegal surveillance, organized stalking, and global use of Directed Energy Weapons and torture against civilians within and outside the United States. TJ appears on its own behalf

and on behalf of its over 3,500 members ("TJ Members").

31.     TJ maintains the website http://www.targetedjustice.com and publishes a newsletter http://www.targetedjustice.substack.com to disseminate news and information on matters of public interest and practical advice relating to the targeting of individuals. Its web site averages 120,000 page views per month. It has a membership of over three thousand five hundred (3,500) individuals that have sustained and continue to suffer injury-in-fact as a result of Defendants' illegal and unconstitutional acts and omissions in the course of their official duties.

32.     On February 12, 2019, Targeted Justice sent a cease and desist letter to Defendants FBI, Kable Jr., USDOJ and DHS demanding that they immediately Cease and Desist their use of government personnel and any external groups, to commit organized stalking activities against Targets, attacking civilians with psychological torture techniques, including stalking, gang stalking, harassment, and intimidation.

33.     For the Declaratory Judgment and Injunctive Relief portions for this complaint, TJ appears on its behalf and on behalf of 450 of its members who submitted information demonstrative of their injury-in-fact resulting from Defendants' and their predecessors' unconstitutional and illegal continuous and uninterrupted conduct dating back to at least 2003.

<u>Individual Plaintiffs</u>

34.     Plaintiff **Dr. Leonid Ber,** of legal age, single, U.S. citizen, medical doctor, resides in Bloomingdale, Illinois. Plaintiff Ber became aware he was a TI on or around 2019. Plaintiff Ber came to the United States in 1993 on an H1-B visa and in 2003 became a naturalized citizen of the United States. Although his family migrated from Russia to Germany, he instead chose to come to America because of our nation's dedication to the western

principles, its history, the Constitution, and The Declaration of Independence. Coming from a totalitarian regime, it never occurred to Plaintiff Ber that he would encounter governmental operatives acting in contravention of the Nuremberg Code and the Geneva Convention violating their civil rights and their presumption of innocence. Plaintiff Ber has been diagnosed with Havana Syndrome.

35.     Plaintiff **Karen Stuart,** of legal age, United States citizen, married, retired National Security Agency Intelligence Analyst residing in Columbia, Maryland. Ms. Stuart is a whistleblower that believes she's became a TI around 2006.

36.     Plaintiff **Dr. Timothy Shelley,** of legal age, United States citizen, single, investigative journalist and attorney-at-law is a resident of Kennett Square, Pennsylvania. Plaintiff Shelley realized that he was a TI in 2016. However, he believes his targeting began decades before.

37.     Plaintiff **Winter Calvert**, of legal age, United States citizen, engineer and a resident of Houston, Texas. On information and belief, Mr. Calvert has been a TI since at least 2011. For over 25 years, and throughout his activism on behalf of Targeted Individuals that began in 2017, Plaintiff Calvert has been also known as Richard Lighthouse.

38.     Plaintiffs **Armondo Delatorre** and his wife **Berta Jasmin Delatorre** are United States citizens, married to each other, are TIs since 2019. They are residents of Alvin, Texas. They sue on their behalf and on behalf of and custodians of their minor daughter, **J.D,** born in 2019. Due to her tender age, it is impossible that J.D. could present a national security concern or be a TI. Like her parents, three-year-old J.D. is the victim of targeting as described herein and suffers from V2K since at least August 2022.

39.     Plaintiff **Deborah Joanne Mahanger** of legal age, United States citizen, former

FBI agent, mother, is a resident of New Hampshire. She became aware she was a TI on or about 2019.  Plaintiff Mahanger also appears on behalf of and as custodian for her 8-year-old daughter **L. M.** who is also a TI. Both been diagnosed with Havana Syndrome.

40.     Plaintiff **Lindsay J.  Penn,** of legal age, United States citizen, married, real estate broker, mother, United States citizen and resident of Houston, Texas, became aware she was a TI in 2016.

41.     Plaintiff **Melody Hopson**, of legal age, United States citizen, single, mother, resident of Deer Park, Texas, became aware she was a TI around 2020 although she believes her targeting began on or around 2014.

42.     Plaintiff **Ana Robertson Miller**, of legal age, United States citizen, married, paralegal, mother, and resident of Cypress, Texas, became aware in 2016 that she was a TI but believes her targeting could have begun as far back as 2013. In 2019 Ms. Miller began enduring gruesome DEW attacks.

43.     Plaintiff **Yvonne Mendez,** of legal age, United States citizen, single, mother, and resident of Houston, Texas believes she has been a TI for over 19 years.

44.     Plaintiff **Devin Delainey Fraley,** of legal age, United States citizen, single, mother, resident of San Antonio, Texas, became aware she was Ti in 2016 but that her targeting began years before. In 2019 she started enduring DEW attacks and experiencing V2K.

45.     Plaintiff **Susan Olsen**, of legal age, United States citizen, single, nurse, resident of Fort Myers, Florida, became aware she was a TI in 2015 but recognizes she may have been a TI for a longer time.

46.     Plaintiff **Jin Kang**, of legal age, United States citizen, single, attorney-at-law, resident of East Brunswick, New Jersey, became aware he was a TI in 2015, but recognizes he

may have been a TI for a longer time

47.     Plaintiff **Jason Foust**, of legal age, United States citizen, single, anthropologist, resident of Houston, Texas became aware in 2016 that he was a TI although he believes his targeting began in 2015.

<u>Defendants</u>

48.     Defendant **Federal Bureau of Investigation** ("FBI") is the agency vested with the statutory responsibility of preparing and maintaining the Terrorist Screening Database ("TSDB"), colloquially known as "the Watchlist" as well as that of answering Plaintiffs' Privacy Act Requests. It is brought as Defendant in this case for its failure to comply with the Privacy Act.  Defendant FBI is also responsible for creating and maintaining the TSDB, having also the authority to nominate and include individuals thereto.

49.     **Defendant Department of Homeland Security** ("DHS") is the agency vested with the responsibility of funding, creating and approving the standard operating procedures implemented in the Fusion Center Network under the agency's absolute discretion and control as well as that of answering Plaintiffs' Privacy Act Requests. DHS is made a defendant in this case for its failure to comply with the Privacy Act.

50.     Defendant **Christopher Wray** is Defendant FBI's director exercising his oversight and control responsibility to ensure regulations and procedures at the Terrorist Screening Center ("TSC") and its product, the TSDB, comply with the United States Constitution. He is personally liable to Plaintiffs for their nomination to the TSDB, causing and/or enabling the deprivation of their substantive and procedural Due Process rights contained in the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and, further, by enabling their targeting, unauthorized experimentation and torture in violation of their rights

13

under the First, Fourth, and Eighth Amendments of the United States Constitution and, further, their right to be free of torture under the Convention Against Torture. He is sued both in his official and personal capacity.

51. Defendant Attorney General **Merrick Garland** is responsible for ensuring all procedures and regulations at FBI and TSC comport and comply with the mandate and protections embodied within the United States Constitution, a ministerial duty he has disregarded in the preparation, maintenance and use of the TSDB. He is personally liable to Plaintiffs for causing and/or enabling the deprivation of their substantive and procedural Due Process rights contained in the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and by enabling their targeting, unauthorized experimentation and torture in violation of their rights under the First, Fourth and Eighth Amendments of the United States Constitution as well as their right to be free of torture under the Convention Against Torture. He is sued both in his official and personal capacity.

52. Defendant **Charles Kable, Jr.** is the TSC's director who develops and maintains the federal government's TSDB, and accepts the nominations of Plaintiffs and other similarly situated American citizens made to the federal terror watch list. Defendant Kable also oversees the dissemination of the stigmatizing TSDB label including Plaintiffs, TJ Members, and other similarly situated American citizens to state and local authorities, foreign governments, private corporations, private contractors, airlines, gun sellers, car dealerships, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals. Defendant **Charles Kable, Jr.** has failed to observe Plaintiffs' and TJ Members' constitutional protections and guarantees. He is personally liable to Plaintiffs for causing and/or enabling the deprivation of their substantive and procedural Due Process rights contained in the Fifth, Sixth

and Fourteenth Amendments of the United States Constitution. Defendant Kable is personally liable to Plaintiffs by enabling their targeting, unauthorized experimentation and torture in violation of their rights under the First, Fourth and Eighth Amendments of the United States Constitution as well as their right to be free of torture under the Convention Against Torture. He is sued both in his official and personal capacity.

53.     Defendant **Alejandro Mayorkas** is Defendant DHS' Secretary, is responsible for the oversight of his agency's collaboration with Defendant FBI's TSC for the nomination process of individuals to the TSDB. **Defendant Mayorkas** is also sued in his personal capacity as the official responsible for the supervision and implementation of unconstitutional operating procedures at the National Network of Fusion Centers[3] that implement the illegal organized and systemic surveillance and stalking procedures carried out against Plaintiffs and TJ Members. He is personally liable to Plaintiffs for causing and/or enabling the deprivation of their substantive and procedural Due Process rights contained in the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and by enabling their targeting, unauthorized experimentation and torture in violation of their rights under the First, Fourth and Eighth Amendments of the United States Constitution as well as the Convention Against Torture. He is sued both in his official and personal capacity.

54.     Defendant **Kenneth L. Wainstein** is Defendant DHS's Under Secretary for Intelligence and Analysis. He provides the Secretary, DHS senior leadership, DHS components, and state, local, tribal, territorial, and private sector partners the homeland security intelligence and information used in their operations. He is sued in his official as well as personal capacity

---

[3]     Congress' definition of fusion centers is: "a collaborative effort of 2 or more Federal, State, local, or tribal government agencies that combines resources, expertise, or information with the goal of maximizing the ability of such agencies to detect, prevent, investigate, apprehend, and respond to criminal or terrorist activity." Implementing Recommendations of the 9/11 Commission Act of 2007, P.L. 110-53, § 511, 121 Stat. 317, 318-24 (2007). http://www.gpo.gov/fdsys/pkg/PLAW-110publ53/pdf/PLAW-110publ53.pdf.

since he is responsible for the supervision and control of the organized stalking endeavors carried out against Plaintiffs through the National Fusion Center Network.

## IV. LEGAL AND FACTUAL BACKGROUND

<u>Preamble to this Lawsuit</u>

55.     The foregoing allegations are realleged and incorporated herein.

56.     Plaintiffs served on Defendants Garland, Wray, Kable Jr. and Mayorkas a Notice of Writ of Mandamus/demand letter dated December 21, 2022 in an effort to carry out reasonable diligence to prevent the filing of this complaint. See **Exhibit 3**.

57.     Plaintiffs have expended due diligence to unearth the "what" element and the "who" element surrounding the Targeting program. Defendants' refusal to adequately reply to Plaintiffs' Privacy Act requests constitutes a concealment mechanism directed at preventing them from uncovering the full spectrum of players and critical facts of the secret human experiment known as the Targeting program.

58.     In an attempt to initiate a non-existent redress procedure, individual Plaintiffs served on Defendant FBI and Defendant DHS Privacy Act requests asking for information about their inclusion in the TSDB under their agency's control. Plaintiffs' requests were sent on the following dates:

a. Plaintiff Leonid Ber: 11/29/22 (FBI); 11/30/22 (DHS);

b. Karen Stewart: 11/26/22 (DHS);  1/4/23 (FBI);

c. Dr .Timothy Shelley: 12/31/22 (USDOJ, FBI and DHS);

d. Winter Calvert: 12/1/22 (FBI); 12/2/22 (DHS);

e. Armondo Delatorre: 11/22 (FBI)

g. Deborah Mahanger: 12/2/22 (FBI); 12/2/2022 (DHS) 12/3/2022 (USDOJ);

h: L Mahanger, a minor: 12/2/22 (FBI); 12/2/2022 (DHS) 12/3/2022 (USDOJ);

i. Ana Robertson Miller: 12/4/22 (FBI, DOJ and DHS);

j Melody Ann Hopson: 12/12/22 (FBI);  12/30/22 (DHS and DOJ) ;

k Devin Fraley:  12/12/22 (FBI); (12/31/22 (DHS);

l Jason Foust: 12/3/22 (FBI, DOJ and DHS)

59.     Defendant FBI and/or Defendant DHS refused to produce information in response to Plaintiffs' Privacy Act requests. The Defendants either denied having any responsive documents or included a generic Glomar denial stating that the agency "*cannot confirm or deny*" any of the information requested.

60.     Defendants' Glomar responses to Plaintiffs' Privacy Act requests constitute a violation of Executive Order 13526 that prohibits the classification of information to conceal violations of law or prevent embarrassment to the agency.

61.     Defendant FBI and Defendant DHS violated the Privacy Act because even though all of Plaintiffs' names are supposed to appear in a subcategory of the TSDB, neither agency admitted this fact or produced any information attesting to it.

62.     Defendants' failure to reply to the letter dated December 21st, 2022 sent on behalf of TJ and the Plaintiffs compelled the filing of this complaint.

<u>Defendants' Inter-Agency Scheme</u>

63.     On September 16, 2003, President George W. Bush issued the Homeland Security Presidential Directive 6 (HSPD-6) to develop, integrate, and maintain thorough, accurate, and current information about individuals known or appropriately suspected to be or

have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism.

64.     Thereafter, Congress likewise mandated greater sharing of terrorist information among federal departments and agencies, requiring the protection of privacy and civil liberties.

65.     HSPD-6 authorized the Attorney General to create the TSC to consolidate the federal government's approach to terrorism screening and to provide for the appropriate and lawful use of terrorist information in screening processes.

66.     The TSC is an inter-agency operation under the control of Defendant FBI but also involves Defendant DHS and other agencies of the United States government.

67.     Under the purview of Defendants Wray and Kable Jr., the TSC is responsible for the creation and maintenance of the TSDB, a centralized collection of information to include and monitor known or suspected terrorists ("KST"), including biographic and biometric data about them.

68.     The Terrorist Review and Examination Unit ("TREX") within the TSC is the division responsible for carrying out the investigations on people nominated to the TSDB.

<u>The TSDB Secret Ex Parte Nominating Process</u>

69.     Defendants Wray and Kable Jr. have a ministerial duty to adhere to the precepts of the United States Constitution upon drafting, maintaining and disseminating the TSDB.

70.     HSPD-6 mandated the implementation of a terrorist-screening process for the creation of the TSDB that had to be consistent with the provisions of the Constitution and applicable laws, including those protecting the rights of all American citizens.

71.     In order to nominate a subject for entry into the TSDB, the United States Constitution requires that Defendant FBI have a reasonable suspicion to believe that the subject is a known or suspected terrorist ("KST").

72.     When a citizen or resident of the United States is nominated to the TSDB, he or she is not notified of the pending nomination nor afforded an opportunity to challenge it.

73.     "[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights." Joint Anti–Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring).

74.     Executive Order 13526's Section 1.7 precludes Defendants from shrouding with a cloak of secrecy the Target experimentation program. This section provides as follows:

**Sec. 1.7. Classification Prohibitions and Limitations.**

 (a) In no case shall information be classified, continue to be maintained as classified, or fail to be declassified in order to:

 (1) Conceal violations of law, inefficiency, or administrative error.

75.     Defendant FBI acknowledges that although it is supposed only to nominate subjects of predicated investigations for inclusion in the TSDB, in certain circumstances they will add a person who is not the subject of a predicated investigation because that person allegedly "*poses a threat*".

76.     Foreign governments, the State Department, the Central Intelligence Agency, the Defense Intelligence Agency, the National Security Agency and Defendant FBI and Defendant DHS nominate people for inclusion in the TSDB.

77.     Form FD-930, also known as "Standard Nomination Form" or "Standard Nomination Tool", is used by private individuals, corporations and the intelligence community (IC) to nominate people for the TSDB. See **Exhibit 4.**

78.     By submitting to Defendant FBI a Form FD-930 attached hereto as **Exhibit 4** of this complaint, anyone can nominate a person to the TSDB.

79.     An identical copy of the standard nomination form is published in the

Department of State's Viper program web page for the nomination of foreign nationals to the TSDB. **Exhibit 5.**

80.     The Department of State categorizes the Standard Nomination Form as an "unclassified/for official use only" document.

81.     Form FD-930 is not an official U.S. Government form since it has not been approved by the United States Office of Documents pursuant to the requirements of the Paperwork Reduction Act of 1995.

82.     Form FD-930 does not meet the requirements of the Department of Defense Forms Management Program since it does not meet the requirements of the General Services Administration, Standard and Optional Forms Management Program.

83.     Form FD-930 is thus an illegal document that is used to nominate and place unsuspecting United States citizens and residents on the TSDB.

84.     Pursuant to Fed.R.Evid. 201(c)(2) and (d), Plaintiffs request that this Court take judicial notice of the adjudicative fact that the use of Form FD-930 to nominate persons to the TSDB is contrary to law.

85.     Form FD-930 does not provide for any due process safeguards to prevent the inclusion in the TSDB of United States citizens like the named individual Plaintiffs, those equally situated to them, and TJ Members despite an absence of links to terrorism.

86.     There are no restrictions as to who can fill out and submit Form FD-930 to Defendants regardless of whether the person is a suspected terrorist or not.

87.     On information and belief, private individuals, corporations and foreign governments can submit nominations to Defendant FBI or Defendant NSA through the TSDB nomination form.

88.     The TSDB nomination by private individuals is dangerous and repugnant to the principles contained in the United States Constitution, placing in private hands the capacity to obliterate someone's life for improper motives.

89.     'Nominations' are not supposed to be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

90.     On information and belief, individuals are placed on the TSDB for engaging in the legitimate exercise of First-Amendment protected rights, such as whistleblower or journalist activity, as is the case of Plaintiffs Karen Stewart, Plaintiff Timothy Shelley and Winter Calvert.

91.     On information and belief, other TIs such as Plaintiffs Timothy Shelley, Susan Olsen, Yvonne Mendez and Lindsay Penn were targeted after undergoing a contentious divorce, a child custody battle or the filing of charges against a stalking former spouse.

92.     Defendant FBI's and TSC's decision to conclude that a person is a KST that should be on the TSDB must stem from a 'reasonable suspicion' that the intelligence <u>gathered on the nominated person by 'federal, state, local, territorial, tribal and international partners'</u> supports the conclusion that "the individual engages in, has been engaged, or intends to engage, in conduct constituting, in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."

93.     Defendant FBI doesn't carry out the investigation on the individual nominated to the TSDB. Instead, Defendant FBI delegates this endeavor to the nominating agency or instrumentality and private companies such as the Leidos Company that has been known to corroborate NIS information.

94.     A 2009 Audit Report by the USDOJ Inspector General's Office concluded that "many of the nominations submitted directly to ...were processed with little or no information

explaining why [or how] the subject may have a nexus to terrorism (also known as "derogatory information").[4]

95.     Approval of a nomination to the TSDB does not require concrete facts. The 2013 Watchlisting guidance specifically provided as follows:

> "In determining whether a **REASONABLE SUSPICION** exists, due weight should be given to the specific **reasonable inferences that a NOMINATOR is entitled to draw** from the facts in light of his/her experience and not on unfounded suspicions or hunches. Although irrefutable evidence or **concrete facts are not necessary**, to be reasonable, suspicion should be as clear and as fully developed as circumstances permit." (Emphasis ours)

96.     The Watchlisting Guidance document includes in its definition of terrorism:

> *"...any act that is "dangerous" to property and intended to influence government policy through intimidation."*

97.     The standard to include anyone in the TSDB and secretly submit them to a permanent life of illegal torture, persecution and surveillance is unconstitutionally vague:

> "To meet the **REASONABLE SUSPICION** standard, **the NOMINATOR**, based on the totality of the circumstances, must rely upon articulable intelligence or information which, taken together with rational inferences from those facts, reasonably warrants a determination that an individual is known or suspected to be or has been knowingly engaged in conduct constituting, in preparation for, in aid of, or related to **TERRORISM and/or TERRORIST ACTIVITIES.**" (Emphasis ours).

98.     The particularized derogatory information used to accept, reject, or modify the nomination of a person into the TSDB is supposed to contain an objective factual basis linking the individual to terrorism or terrorist activities.

99.     The particularized derogatory information to include the following: an individual's race, ethnicity, religious affiliation, beliefs and activities protected by the First

---

[4]     See "The Federal Bureau of Investigation's Terrorist Watchlist Nomination Practices, US Department of Justice Office of the Inspector General Audit Division, Audit Report 09–25, May 2009.

Amendment, such as freedom of speech, free exercise of religion, freedom of the press, freedom of peaceful assembly, and the freedom to petition the government for redress of stress of grievances, travel history, associates, business associations, international associations, financial transactions, and/or the study of Arabic.

100.     The <u>particularized derogatory information</u> standard requires that Defendant FBI have 'articulable' intelligence or information which, based on the totality of the facts, and taken together with rational interference from those facts, warrants a determination that the subject is known or suspected to be (or has been) knowingly engaged in conduct constituting, in preparation for, in aid of, or related to terrorism or terrorist activities.

101.     Former TSD Deputy Director Timothy Grogh's statement under Penalty of Perjury given in the context of a judicial procedure stated that "*[T]he TSDB includes identifying information of certain individuals who are not categorized as known or suspected terrorists*."

102.     Plaintiffs request that this Court take judicial notice of TSC Deputy Director Timothy Groh Statement under Penalty of Perjury asserting the following:

> Limited exceptions to the reasonable suspicion standard exist for the sole purpose of supporting certain special screening functions of DHS and State (such as determining eligibility for immigration to the U.S.). <u>Individuals included in the TSDB pursuant to such exceptions are not considered "known or suspected terrorists" and are not screened as such.</u> As a result, <u>any U.S. person who is in the TSDB pursuant to an exception to the reasonable suspicion standard would not be required to undergo heightened aviation security screening at airports on that basis</u> (but could be selected for other unrelated reasons, such as random selection). (Emphasis ours). See **Exhibit 2.**

103.     Including in the TSDB persons that are not known or suspected terrorists is a violation to the Administrative Procedure Act's prohibition on arbitrary government action contained in 5 U.S.C. § 706.

104.     Despite an absence of <u>particularized derogatory information</u> linking Plaintiffs

and TJ Members to terrorism, their names figure in the TSDB.

105.    The TSDBs inclusion standards are so permissive and pliable that they violate Plaintiffs' and TJ Members', procedural and substantive due process rights.

### Vetting of Nominees

106.    Defendant FBI subcontracts to private corporations like the Leidos corporation the task of corroborating non-investigative subjects' personal information upon their nomination to the TSDB and/or their vetting process.

107.    The TSC has no quality control procedure in place to specifically confirm that a person is a known or suspected terrorist (KST) or "Non-Investigative Subjects" (NIS) since they rely on the facts and investigation that the nominating agency provides.

108.    Private corporations known as "watchlisting cells" serve as contractors to Defendant FBI and/or Defendant NSA for obtaining and corroborating the personal data on individuals to be included in the TSDB.

109.    These entities limit their verification to personal information such as names, residential address, contact information, and relatives.

110.    The private contractors that check the information on individuals nominated to the TSDB do not confirm whether the nominee is a known or suspected terrorist.

### The TSDB Subcategories

111.    The TSDB contains a series of subsets of categories that differentiate individuals on the list pursuant to the degree of threat they pose and pursuant to the grounds for their inclusion on the list.

112.    Official US Government, Defendant FBI and Defendant DHS documents and/or statements under penalty of perjury establish that there are conflicting versions of what the

24

categories within TSDB are.

113.     Pursuant to **Defendant DHS regulations** published in **81 Federal Register 19989**, the categories of individuals covered by the TSDB include:

(a) Individuals known or suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism (''known or suspected terrorists'');

(b) Individuals who are foreign nationals or lawful permanent resident aliens and who are excludable from the United States based on their familial relationship, association, or connection with a known or suspected terrorist as described in sec. 212(a)(3)(B) of the Immigration and Nationality Act of 1952 (''INA exceptions'');

(c) Individuals who were officially detained during military operations, but not as Enemy Prisoners of War, and who have been identified to pose an actual or possible threat to national security (''military detainees''); and

(d) Individuals known or suspected to be or have been engaged in conduct constituting, in aid of, or related to transnational organized crime, thereby posing a possible threat to national security (''transnational organized crime actors'').

114.     Conversely, Defendant **FBI regulations** published in **70 Federal Register 43716** list different categories of records within the TSDB as follows:

a. Individuals known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism (''known or suspected terrorists'');

b. Individuals identified during a terrorist screening process as a possible identity match to a known or suspected terrorist;

c. Individuals who are repeatedly misidentified as a possible identity match to a known or suspected terrorist (''misidentified persons''); and

d. Individuals about whom a terrorist watchlist-related redress inquiry has been made.

115.     Recent Defendant FBI agents' Declarations and Statements under Penalty of Perjury given in the <u>Elhady</u> case, *supra*, challenging the TSDB's Watchlist component provide yet another version of the categories within the TSDB:

Handling Code 1 - Outstanding Arrest Warrant

Handling Code 2 - Under Active Investigation

Handling Code 3 - Individual has Possible Ties to Terrorism

Handling Code 4 - Identity Provided has Possible Ties to Terrorism. See Exhibit 5.

116.     The first two categories are commonly referred to as "Known and Suspected Terrorists" and include the 'Selectee', and 'No Fly Lists'. Inclusion on the first two subcategories of the TSDB, the No Fly or Selectee Lists requires additional substantive derogatory criteria.

117.     On information and belief, the "Expanded Selectee List" consists of individuals for whom the TSDB record contains a full name and a full date of birth but lacks sufficient derogatory information linking the person to terrorism so as to categorize him or her as a KST.

118.     Known terrorists for whom there is an outstanding arrest warrant are grouped under TSDB's **Handling Code 1** category, also referred to as the "No Fly" list.

119.     A "known terrorist" is an individual who has been (a) arrested, charged by information, indicted for, or convicted of a crime related to terrorism and/or terrorist activities by U.S. Government or foreign government authorities; or (b) identified as a terrorist or a member of a terrorist organization pursuant to statute, Executive Order, or international legal obligation pursuant to a United Nations Security Council Resolution.

120.     Any individual, regardless of citizenship, may be included on the No Fly List when the TSC determines the individual meets additional criteria in at least one of the following criteria, where the individual poses:

 (a) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 233 1(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331 (5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or  civil aviation security);

26

 (b) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 233 1(5)) with respect to the homeland;

(c) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 233 1(I)) against any US Government facility abroad and associated or supporting personnel, including US embassies, consulates and missions, military installations (as defined by 10 U.S.C. 280 1(c)(4)), US ships, US aircraft, or other auxiliary craft owned or leased by the US Government; or,

(d) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

121.    Although mere guesses or hunches are not enough to constitute a reasonable suspicion that an individual is a suspected KST, "concrete facts are not necessary" to include someone in the TSDB. [5]

122.    The TSDB's second category is known as the **Handling Code 2** or "Selectee List".

123.    The Selectee List comprises the names of suspected terrorists under active investigation.

124.    A "suspected terrorist" is "an individual who is reasonably suspected to be engaging in, has engaged in, or intends to engage in conduct constituting, in preparation for, in aid of, or related to terrorism and/or terrorist activities."

125.    On information and belief, the individuals in the No Fly and Selectee List components of the TSDB encounter obstruction of travel at United States' ports of entry and are the only ones that may submit a redress request for removal from the list.

126.    The 'No Fly' and 'Selectee' lists are commonly known as the "Watchlist" comprised of KST.

127.    There is another category of individuals included the TSDB: that of persons who

---

[5]     http://archive.today/2015.10.15-232102/https://theintercept.com/2014/07/23/blacklisted/

do not meet the "substantive derogatory criteria". They are grouped into "Handling Codes 3 and 4".

128.     Handling Code 3 is also known as the 'Expanded Selectee' list.

129.     According to Defendant FBI, Handling Code 3 comprises Individuals with 'Possible Ties to Terrorism'.

130.     Pursuant to the FBI Handling Code 4 comprises people whose "Identity Provided has Possible Ties to Terrorism'.

131.     On information and belief, the individuals included in the TSDB who "*are not considered 'known or suspected terrorists' and are not screened as such*" are also referred to as NIS  are grouped in the categories labeled as "Handling Code 3" or "Handling Code 4".

132.     TSDB's "Handling Code 3" and "Handling Code 4" comprise individuals who do not  meet the criteria required for Handling Code 1 or 2 and are referred to as NIS.

133.     Former TSC Deputy Director Timothy Mr. Groh stated under Penalty of Perjury that "any US person who is in the TSDB pursuant to an exception to the reasonable suspicion standard would not be required to undergo heightened aviation security screening at airports on that basis." See **Exhibit 5.**

134.     This is the reason why all but two Plaintiffs found out that their names had been included in the TSDB's NIS/ Handling Code 3 / 4 lists: since they do not represent a real terrorist threat, they do not face undue hardship when traveling.

135.     Since NIS do not encounter obstacles when traveling, they seldom find out that they are on the TSDB.

136.     NIS are allowed to travel without additional burdens or obstacles because they pose no terrorist threat.

137.     Informing TIs of their inclusion in the TSDB would grant them the mechanism of seeking redress to remove of their names from it.

138.     On information and belief, the only information required to include a NIS in the TSDB is his or her first and last name and "ANY" date of birth.

139.     Based on Defendant FBI'S own statistics, NINETY-SEVEN PERCENT (97%) of the persons listed on Defendant FBI's TSDB are not terrorists. **Exhibit 5**.

140.     Only the first two components of the TSDB – Handling Code 1 and Handling Code 2 make up the "Watchlist" that contains the names of the KST.

141.     When intervening with a non-investigative subject during a routine situation, law enforcement officials are forbidden from telling the individual they are on the list.

142.     The TSC includes within the National Crime Information Center's (NCIC) database the "Watchlist" subset of the TSDB comprised of KST included in the "No Fly" and "Selectee" list.

143.     NIS are not included in the "Watchlist".

144.     NIS are not listed in the NCIC.

145.     The NCIC is a compilation of 14 person files or categories. To wit: 1) KST File, (the Known or Suspected Terrorist ("KST") File, which is populated with a subset of TSDB information; 2) Supervised Release;  3) National Sex Offender Registry; 4) Foreign Fugitive; 5) Immigration Violator; 6) Missing Person; 7) Protection Order; 8) Unidentified Person; 9) Protective Interest; 10) Gang; 11) Wanted Person; 12) Identity Theft; 13) Violent Person; and 14) NICS Denied Transaction.

146.     The NCIC also includes 7 property files containing records of stolen articles, boats, guns, license plates, parts, securities, and vehicles.

147.     The NCIC does not include the TSDB's NIS/Handling Codes 3 / 4 lists because the people listed in them don't constitute a terrorist threat.

148.     United States citizens included under "Handling Code 3 / 4" or "Non-investigative subjects" have no available mechanism or formal procedure to challenge their secret inclusion on the TSDB because they are prohibited from discovering their status.

<u>Impact to United States citizen or Residents Upon Being Secretly Listed</u>

149.     On information and belief, those included in the TSDB's NIS/Handling Codes 3 / 4 lists are unwilling participants in an experimentation and torture program and are known as "Targets".

150.     A Target in the TSDB's NIS/Handling Codes 3 / 4 lists is also referred to as a Targeted Individual.

151.     Once an individual has been placed on the TSDB's NIS/Handling Codes 3 / 4 lists, his or her name lingers on it indefinitely and/or permanently.

152.     A person's permanent inclusion in the TSDB's NIS/Handling Codes 3 / 4 lists is the equivalent of an unconstitutionally perennial designation as a "*person of interest*", depriving them of their presumption of innocence and right to procedural and substantive due process.

153.     NIS have no means of redress to remove their names from the TSDB's Handling Codes 3 /4 categories.

154.     The inclusion of the individuals in the TSDB constitutes the kind of government stigmatization that broadly precludes individuals or corporations from a chosen trade or business and also deprives them of liberty in violation of the Due Process Clause. <u>Trifax Corp. v. District of Columbia</u>, 314 F.3d 641, 644 (D.C. Cir. 2003).

155.    The lack of a viable mechanism to remove a wrongfully-listed United States citizen in the TSDB ensures his or her inclusion on it becomes indefinite and/or permanent.

156.    Once a NIS is listed in the TSDB's NIS/Handling Codes 3 / 4 lists and in violation of the First, Fourth, Fifth and Sixth and Eighth Amendments to the United States Constitution, Defendants order and/or facilitate state, tribal and federal agencies to constantly track and carry out his or her physical and electronic surveillance and psychological torture.

### Defendants' Illegal and Harmful Disclosure of False Personal Information

157.    The TSDB does not contain classified national security information.

158.    TSDB information is "For Official Use Only//Law Enforcement Sensitive".

159.    The label For Official Use Only//Law Enforcement Sensitive" means that the information is protected from disclosure and is accessible only to persons who have an official 'need to know,' such as federal law enforcement officials for their screening and vetting activities.

160.    Unauthorized disclosure of an individuals' inclusion in the TSDB is prohibited under the Privacy Act.

161.    In violation of such policies, Defendant FBI and TSC distribute the TSDB to at least 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies and approximately 533 private entities through its National Crime Information Center ("NCIC") system.

162.    The list is also shared with more than 60 foreign governments and private entities such as the following: private correctional facilities, private security services for governmental facilities and hospitals, companies providing criminal justice dispatching services or data processing/information services providing services to governmental criminal justice agencies,

private probation and pretrial services companies, private city attorneys, a private police department for an airport, a private police department for a transportation authority, private police departments for two private incorporated communities, an inmate transport service, an entity that provides forensic services to detect and identify criminals, court constable services, and animal shelters.

163.    **In 2019, Defendant FBI publicly acknowledged it shares the TSDB with 1441 non-government entities.** These include private employment, background check, and credit agencies.

164.    Defendants widely disseminate the TSDB among citizen policing organizations such as Infragard and Citizen Corps that perpetrate illegal/rogue vigilante conduct against NIS under the pretense that they are KST.

165.    Defendant Majorkas is responsible for the enactment and implementation of highly unconstitutional operating procedures throughout the National Network of Fusion Centers that have carried out the illegal surveillance, organized stalking and psychological torture of Plaintiffs and TJ Members.

<u>Prior  Legal Challenges to the TSDB</u>

166.    Disclosure of TSDB information inevitably occurs when a known terrorist included under its Handling Code 1 (No-Fly list) or a suspected terrorist included under its Handling Code 2 (Selectee List) encounter problems when attempting to board a plane or a ship.

167.    The secrecy veil of watch-listing gets pierced at the airport or ports when any KST attempts to travel when the Transportation and Safety Administration intervenes with the person during pre-boarding screening.

168.    The myriad of travel obstacles that KST have encountered as a result of their

inclusion in the 'Watchlist' component of the TSDB (No-Fly and Selectee lists) since its inception has prompted legal challenges and Congressional mandates.

169.     Prior legal challenges to the TSDB have <u>only</u> involved people listed as KST in the TSDB's "Watchlist" whose right to travel has been impaired.

170.     As a reaction to the disruptions to United States citizens' travels resulting from their inclusion in the TSDB, Congress enacted acts and regulations to incorporate due process guarantees to the individuals listed in the "No Fly" and the Selectees lists.

171.     49 U.S. Code § 44926 provides for the appeal and redress process for passengers wrongly delayed or prohibited from boarding a boarding a commercial aircraft because they have been wrongly identified as a threat.

172.     49 U.S.C. §§ 44903(j)(2)(C)(iii)(I) gives the Transportation and Safety Administrator the obligation to establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct the information contained in the system.

173.     TSA implements this mandate through DHS TRIP, which serves as a single point of contact for a wide variety of complaints and inquiries regarding travel difficulties.

174.     49 U.S.C. §§ 44903(j)(2)(G)(i) provides that the Administrator shall establish a timely and fair process for individuals identified in the "No Fly" and "selectee" lists to appeal to the Transportation Security Administration the determination and to correct any erroneous information.

175.     On information and belief, when the TSC receives a redress petition channeled through the TSA or the FBI's Congressional Office, Defendant FBI relays the investigation on

whether it is current, relevant, trustworthy, and valid of the derogatory information on the individual to the same 'federal, state, local, territorial, tribal and international partner' that nominated the person in the first place.

176. Pursuant to the TSC Redress Program SOP, no one at the FBI, TSC or TREX intervenes in the 'independent processes' undertaken by 'TSC's federal, state, local, territorial, tribal and international partners' in response to a redress inquiry.

177. In other words: in the course of the existing redress proceedings (that do not cover individuals listed under NIS/Handling Code 3 / 4), the TSC delegates to and does not interfere with the nominating agency or entity the investigation on the validity and accuracy of its own criteria of nominating the person petitioning for removal from the TSDB.

178. Thus TSA redress involves little more than returning the nomination to the original nominating agency – who routinely re-affirm it.  There is no meaningful, independent review of the challenge.

179. A December 8, 2005 Washington Times article reported that the Transportation Safety Administration admitted to Congress that out of the 30,000 airline passengers that had requested so far from the Department of Homeland Security Department to remove their names from TSDBs, only 60 or less than .02% had been successful.

180. The "redress" procedures set forth in paragraphs 170-173 above are limited to those individuals that are KST and thus encountered obstacles in the course of traveling, giving them an opportunity to challenge their wrong or mistaken inclusion in the TSDB through the redress procedures currently in place.

181. On information and belief, no court has had to adjudicate a case or controversy involving the constitutionality of the TSDB as it pertains to NIS and/or Handling Code 3 / 4

categories.

<u>The TSDB as an Unconstitutional Blacklisting Mechanism of Individuals</u>

182.     Aside from not notifying individuals in the United States of their nomination and inclusion to the TSDB, United States NIS in the TSDB aren't afforded a procedure to contest or challenge their nomination because <u>it doesn't exist</u>.

183.     The only redress procedure that exists is contained in the TSC's "Redress Standard Operating Procedures" dated December 8, 2015.

184.     According to the TSC's "Redress Standard Operating Procedures" manual dated December 8, 2015. "[r]edress it the process whereby an individual may seek the help of the screening agency in addressing the cause of an adverse screening experience or outcome related to the use of the TSDB data by filing an inquiry with the screening agency or DHS Traveler Redress Inquiry in cooperation with the TSC and the nominating/originating agency, provides assistance by determining the case if the adverse experience, verifying that all relevant information relied upon in the screening process is current, accurate and thorough, and making any warranted corrections to pertinent records. The redress process as defined in this paragraph does not apply to inquiries related to government processes unrelated to the mission of the TSC."

185.     Pursuant to Redress Operating Procedures Manual, the TSDB is a sensitive but unclassified database and does not contain any derogatory information.

186.     In June, 2016, Kelli Ann Burriesci, Department of Homeland Security's then-Deputy Assistant Secretary, testified under oath before Congress that "*there's not a process afforded a citizen prior to getting on the list*". Pursuant to Fed.R.Evid. 201(c)(2) and (d), Plaintiffs request that this Court take judicial notice of this adjudicative fact.

187.     Defendants have deliberately concealed Plaintiffs' and TJ Members' inclusion in the TSDB's "Handling Code 3" or "Non-investigative subjects" categories.

188.     Defendants' lack of notice to Plaintiffs and TJ Members of their inclusion in the TSDB prevented them from discovering that they had sustained an injury susceptible to redress.

189.     The legal provisions available to individuals in the Watchlist to seek redress from their inclusion in the TSDB are not available to those in the NIS/Handling Code 3 / 4 lists.

<u>TSDB's Unconstitutional Bloating: The Numbers Do Not Add Up</u>

190.     Defendant FBI and NSA's statistics regarding the number of records in the TSDB that relate to <u>actual</u> KSTs as explained below demonstrate that in the United States there are hundreds of thousands of individuals that: a) are not KST; b) were nonetheless secretly and perpetually included in the TSDB; and c) have no legal recourse for their name's removal therefrom.

191.     **The contradictions between official government sources regarding the TSDB's records are obvious.  And the numbers do not add up.**

192.     The Department of Justice's Office of The Inspector General's May, 2009 Audit Report 09-25 "The Federal Bureau Of Investigation's Terrorist TSDB Nomination Practices" found that 35% of the nominations to the lists were outdated, many people were not removed in a timely manner, and tens of thousands of names were placed on the list without an adequate factual basis.

193.     In 2008, **Rick Kopel,** principal deputy director of Defendant FBI Terrorist Screening Center, appeared before the House Homeland Security Sub Committee on Transportation Security and stated that the TSDB contained approximately one million records relating to 400,000 individuals of whom 3% (12,000) were U.S. persons. (U.S. Persons, as

36

defined in Executive Order 12333, are U.S. citizens and legal permanent residents.)

194.    Conversely, eight years later, the Vice-Chair woman of the Senate Intelligence Committee, Sen. Diane Feinstein, ascertained in 2016 that there were over one million records in the TSDB but only 5,000 ( 0.5 percent or one two-hundredth) of them were Americans.[6]

195.    On September 2014, Transportation Safety Administration's Christopher Piehota testified before the House of Representatives' Subcommittee on Transportation Security that by 2013 the TSDB had 500,000 records and in 2014 the list contained 800,000 identities.

196.    Mr. Piehota's testimony confirmed that **an estimated 300,000 additional records were included in the first 9 months of 2014 for an average of 33,333 new individuals added per month.**

197.    In 2014, Mr. Piehota testified that the 8% of the 800,000 identities in the TSDB -- or 64,000-- were in the "No Fly List" or Handling Code 01.

198.    Thereafter, former Deputy FBI Director Timothy P. Groh stated under penalty of perjury in *Elhady v. Piehota*, 303 F.Supp.3d 453 (2017) that there were approximately 1.16 million persons in the TSDB and that only approximately 0.5% (fewer than 5,000) of those were US persons.[7]

199.    A 2007 GAO report found that TSC rejects only approximately one percent (1%) of all nominations to the TSDB.

200.    However, in the discovery under penalty of perjury produced in the *Elhady* case, Defendants submitted the table below including the data regarding nominations, acceptances and rejections. When subtracting the 'additions' and 'rejections' to the number of nominations,

---

[6]    http://archive.today/2023.01.07-071544/https://lawandcrime.com/video/details-of-fbi-watch-lists-revealed-including-number-of-americans-included/

[7]

there is a large number that remains unaccounted for.

| Calendar Year | Total Nominations | Total Adds | Rejections |
|---|---|---|---|
| 2008 | 248,234 | 66,862 | 916 |
| 2009 | 229,369 | 54,999 | 424 |
| 2010 | 262,411 | 64,197 | 1,346 |
| 2011 | 285,681 | 77,925 | 1,203 |
| 2012 | 344,258 | 106,468 | 1,153 |
| 2013 | 482,114 | 159,829 | 1,820 |
| 2014 | 431,086 | 115,627 | 1,218 |
| 2015 | 454,173 | 148,730 | 1,021 |
| 2016 | 518,352 | 176,014 | 2,671 |
| 2017 | 480,984 | 166,603 | 5,215 |

201.    TSC Audits of Defendant FBI produced additional information asserting that approximately 3% of the TSDB is designated as Handling Code 1 or 2.

202.    **The remaining 97% is designated as Handling Code 3 or 4.**

203.    On March 11, 2019, Mr. Groh declared under Penalty of Perjury that US persons (citizens and lawful permanent residents) make up less than .5 percent (i.e., one two-hundredth) of the identities in the TSDB. **Exhibit 5**.

204.    The vertiginous increase in the number of people included in the TSDB reflects Defendant Wray's and Defendant Kable's and their predecessors' failure to adhere to constitutional precepts, the law and Defendant FBI's own standards and procedures.

205.    FBI's reckless, unconstitutional and illicit approval of nominations to the TSDB

results in the inclusion of an estimated 98.9% of the people nominated to it.

206.    A 2007 United States Government Accountability Office Report to Congressional Requesters entitled "Terrorist TSDB Screening: Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List", found that TSC rejects only approximately one percent (1%) of all nominations to the TSDB.

207.    In the Elhady v. Kable case, Customs and Border Protection admitted that it has never publicly identified an act of terrorism that the TSDB helped prevent.

208.    Defendant FBI representatives in the Elhady v. Kable case **admitted that they were unaware of a single act of terrorism halted due to the TSDB.**

209.    The 2007 GAO Report determined that 45% of the TSDB records related to redress complaints reflected that the information on the individuals used to include them on the list was inaccurate, incomplete, outdated, and/or that they had been incorrectly included.

The Disclosure of the TSDB Beyond the TSC

210.    Including a person in the TSDB constitutes the targeting of an individual within the Unites States.

211.    On information and belief, a Targeted Individual (TI) is someone who has been selected by Defendant Federal Bureau of Investigations (FBI), Defendant Department of Homeland Security (DHS) or other intelligence agencies of the federal government to unwillingly participate in an experimental torture program.

212.    On Information and belief, this program was developed under the Central Intelligence Agency's MK-Ultra project and is designed to break down the individual and "neutralize the person," using psychological, physical, and emotional stress.

213.    On information and belief, following Defendant FBI COINTELPRO model, this

program imposes unconstitutional restrictions and limitations on society through intimidation, fear, and threats. Political activists, labor union leaders, scientists, and whistle-blowers are a sampling of the main targets of the program in violation of their First Amendment rights. However, on information and belief, people are also randomly chosen. Familial and spousal relationships are usually destroyed, as part of this psychological torture.

214.    On information and belief, once an individual is on the list, the NSA unconstitutionally authorizes and/or carries out physical and electronic surveillance and stalking on them through various instrumentalities, organizations and entities such as DHS' National Network of Fusion Centers, Infragard, citizen Watch Groups, Sheriffs and Police Departments.

215.    This conduct is referred to as "Organized Stalking" or "gang-stalking" and entails the administration of terror tactics on United States citizens and lawful residents in violation of their rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

216.    An October 3, 2012, the Senate's Permanent Subcommittee on Investigations issued a report after a two-year investigation that led the Commission to conclude that Fusion Centers "have too often wasted money and stepped on Americans' civil liberties."[8]

217.    The report went on to conclude that Defendant DHS intelligence officers assigned to state and local fusion centers produced intelligence of "uneven quality – oftentimes shoddy, rarely timely, sometimes endangering citizens' civil liberties and Privacy Act protections, occasionally taken from already-published public sources, and more often than not unrelated to terrorism.

---

[8]    https://www.hsgac.senate.gov/imo/media/doc/10-3-2012%20PSI%20STAFF%20REPORT%20re%20FUSION%20CENTERS.2.pdf

218.    The Report went on to state that: "The panel includes several examples of costly and time-consuming investigations undertaken by Fusion Centers employees, **all which emphasize what appear to be the DHS' relentless attempts to enter anyone and everyone into a system of suspicious persons**. " (Emphasis ours).

219.    Defendants Mayorkas and Wainstein create and mandate the policies and standard operating procedures implemented in the National Fusion Center Network that carry out the unconstitutional organized stalking against Plaintiffs, TJ Members and others equally situated to them.

<u>Plaintiffs' Targeting Resulting from Their Inclusion on the List</u>

220.    On information and belief, individual Plaintiffs' names are listed under TSDB's "NIS", "Handling Code 3 or 4" or any other unknown category within the list that is not Handling Code 1 (Known Terrorists/No-Fly List) and Handling Code 2 (Selectee List).

221.    Defendants secretly added the individual Plaintiffs' and TJ Members' names to the TSDB without giving them prior notice.

222.    On information and belief, Individual Plaintiffs and TJ Members were included in the TSDB in retaliation for exercising their First Amendment rights to practice their religion, exercising their freedom of speech, their right to peaceably assemble, and/or to petition the Government for redress of grievances.

223.    The named individual Plaintiffs and/or some of TJ Members have submitted Privacy Act requests to Defendants requesting them to provide the TSDB with their records and to remove their names from it.

224.    Defendants' failure to meaningfully reply and refusal to acknowledge their petition for removal from the TSDB prompted the filing of this complaint.

225.     Defendants' actions constitute a violation to Plaintiffs' and TJ Members' due process and equal protection rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution inasmuch as they: a) deprived them of their right to receive notice about their nomination to the TSDB; b) deprived them of a formal, open explanation of charges and c) deprived them of a meaningful opportunity to challenge and disprove them prior to their inclusion on the list.

226.     Prior to including the named individual Plaintiffs' and TJ Members', Defendant FBI did **not** carry out a constitutionally-mandated investigation observing its own procedures nor did they oblige the minimum due process requirements and adhere to the standard of proof required for their inclusion.

227.     On information and belief, Defendants included the named individual Plaintiffs' and TJ Members' names to the TSDB without any of the required "actual basis linking an individual to terrorism or terrorist activities, also known as particularized derogatory information."

228.     Defendants have failed to provide the named individual Plaintiffs and TJ Members included under the NIS or "Handling Code 3 / 4" categories a legally-meaningful procedure that adheres to the minimum constitutional due process requirements to challenge their inclusion on the TSDB.

229.     The only mechanism available to United States citizens and residents to challenge their inclusion in the TSDB contained in the Redress Standard Operating Procedure Manual is not available to NIS because the first requirement that gives way to the redress process is the completion of the DHS TRIP form documenting the details of the impaired travel plans as a result of the individual's inclusion in the TSDB.

230.     The TSC, which is administered by Defendant FBI, does not accept redress inquiries from the public, nor does it directly provide final disposition letters to individuals who submit redress inquiries through Defendant DHS or Congress.

231.     The TSDB regulations prohibit "notice, access and amendment"  under the Privacy Act. 70 Federal Register 43717 provides, in pertinent part: "Because this system contains classified and law enforcement information related to the government's counter-terrorism, law enforcement and intelligence programs, records in this system have been exempted from notification, access, and amendment to the extent permitted by subsections (j) and (k) of the Privacy Act."

232.     The Convention Against Torture defines torture as follows:

"The term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."

233.     By denying Plaintiffs and TJ Members an adequate process or mechanism to remove their names from the TSDB's NIS/Handling Code 3 / 4 categories, Defendants Wray, Kable, Mayorkas, and Wainstein are personally liable to each individual Plaintiff violating their constitutional rights protected under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

234.     On information and belief, by denying TJ Members residing in the United States and throughout the world a process or mechanism to remove their names from the TSDB's NIS/Handling Codes 3 / 4 categories despite the absence of "particularized derogatory

information" and/or a "reasonable suspicion" that they are KSTs, Defendants Wray and Kable, have facilitated and enabled physical and psychological torture to Plaintiffs' in violation of the "United Nations Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment".

<u>TI's Unconstitutional Sentencing to a Life of Psychological and Physical Harm</u>

235.    The government does not provide a United States citizen or lawful resident with any meaningful opportunity to challenge or controvert the grounds for his or her possible inclusion on the TSDB.

236.    On information and belief, the inclusion of Individual Plaintiffs' names and that of TJ Members on the TSDB causes them to suffer everything from cumulative inconveniences to serious reputational damage, threats to their lives or substantial limitations on privacy and freedom of action as will be set forth below.

237.    On information and belief, as a result of Defendant FBI's unfounded and unconstitutional inclusion of innocent United States citizens such as the named individual Plaintiffs and TJ Members in the TSDB carried out under the direction of Defendant Majorkas through the National Network of Fusion Centers they became targets of surveillance, stalking and directed energy weapons attacks in violation of their fundamental constitutional rights.

<u>Directed Energy Weapons Attacks/Havana Syndrome</u>

238.    On information and belief, as a result of their unfounded and unconstitutional inclusion in the TSDB, the named individual Plaintiffs and TJ Members are victims of Directed Energy Weapons ("DEW") attacks and other unidentified remote weaponry and instruments of harm.

239.    On information and belief, the DEW attacks that the named individual Plaintiffs

and TJ Members have suffered have caused them to develop or are in the way of developing the condition known as "Havana Syndrome".

240.     On information and belief, the use of other unidentified remote weaponry and instruments of harm have caused harm and/or destroyed and/or unlawfully taken property, health and life.

241.     The Department of Defense's Joint Publication 3–13 Electronic Warfare, defines "Directed Energy" ("DE") as:

> "[A]n umbrella term covering technologies that produce a beam of concentrated electromagnetic energy or atomic or subatomic particles. Directed Energy Weapons ("DEW") is a system using DE primarily as a direct means to disable, damage or destroy adversary equipment, facilities, and personnel. DE warfare is military action involving the use of DE weapons, devices, and countermeasures to either cause direct damage or destruction of adversary equipment, facilities, and personnel, or to determine, exploit, reduce, or prevent hostile use of the electromagnetic spectrum (EMS) through damage, destruction, and disruption. "[9]

242.     DE weapons include high-energy lasers, high-power radio frequency or microwave devices, and charged or neutral particle beam weapons. Microwaves and lasers are both part of the electromagnetic spectrum, which includes light energy and radio waves. The distinction between them is the wavelengths/frequency of the energy. While they are both part of the electromagnetic spectrum, laser and microwave weapons operate very differently and have very different effects.

243.     The burns in some of the Plaintiffs are caused by microwave weapons.

244.     Cellular towers and satellites have the energy capacity to fire DEW-- approximately the same amount of energy required to run 3,000 homes.

245.     The required electric capacity of a microwave weapon far exceeds the electrical

---

[9]     See https://www.nationalacademies.org/news/2020/12/new-report-assesses-illnesses-among-us-government-personnel-and-their-families-at-overseas-embassies.National Defense University, *Prism*, Vol. 8, No. 3 (2019)

energy available in any household.

246.    In 2020, the National Academy of Sciences ("NAS"), Engineering and Medicine, which was commissioned by the U.S. State Department to investigate the matter, issued a report stating that the attack from "radio frequency waves" or DEW should be the most plausible explanation for the "Havana Syndrome" illness that US State Department employees at the Cuban Embassy began to experience.

247.    The NAS found that for the Cuban Embassy employees, Havana Syndrome began with the sudden onset of a loud noise, perceived to have directional features, and accompanied by pain in one or both ears or across a broad region of the head, and in some cases, a sensation of head pressure or vibration, dizziness, followed in some cases by tinnitus, visual problems, vertigo, and cognitive difficulties.

248.    CIA Director William Burns admitted that it is "unlikely [that Havana Syndrome cases] have been caused by the use of a 'secret weapon' by a hostile state".

249.    Target program victims show Havana Syndrome symptoms and impairment. Plaintiffs Deborah Mahangor, her daughter and Plaintiff Ber have been diagnosed with Havana Syndrome.

250.    On January 20, 2022, the Central Intelligence Agency stated that the over 1,000 Havana Syndrome cases were caused by DEW attacks on United States citizens stationed in foreign nations could not be traced to a foreign adversary. It concluded that there was no sustained global campaign by a hostile power like Russia or China harassing United States with an untraceable weapon.

251.    The DEW attacks on NIS, United States citizens who have been unconstitutionally included in TSDB's NIS/Handling Codes 3 / 4 lists have caused them to

develop symptoms similar to Havana Syndrome.

252.    Plaintiffs' DEW attacks on NIS result from their unconstitutional inclusion in TSDB's NIS/Handling Codes 3 / 4 lists produce painful physical assaults and burns that take weeks to heal and look like these:

    

## Voice-to-Skull

253.    As a result of the inclusion in the TSDB's NIS/Handling Codes 3 / 4 lists, about two thirds of the named individual Plaintiffs and TJ Members suffer from another kind of remote/directed energy attack known as "Pulse-Modulated Voice Signature" or "Microwave Auditory Effect", commonly known as Voice-to-Skull.

254.    This torture tactic is documented under United States' Patent Office patent 4,877,027 for Hearing System dated June 6, 1988. No civilian has the equipment required to produce a microwave beam that carries a voice signal and produce Voice-to-Skull effect.

255.    This patent consists of a hearing system for human beings in which high-frequency electromagnetic energy is projected through the air in a microwave beam of an intensity less than 3.3 kilowatts per square centimeter to the head of a human being and the electromagnetic energy is modulated to create signals that can be discerned by the human being regardless of the hearing ability of the person.

256. This microwave auditory effect produces in most of the named individual Plaintiffs and TJ Members a torture known as "voice-to-skull" that mimics the hearing of voices or "microwave auditory effect".

257. V2K is an extremely debilitating condition as it operates twenty-four hours a day in a continuous flow of computer-generated derogatory verbiage to obliterate the person's psyche such as: "You're stupid"; "You're fat"; "Why don't you kill yourself?" Approximately two thirds of Plaintiffs and TJ Members have the condition known as V2K.

258. On information and belief, as a result of being included in the TSDB's NIS/Handling Code 3 / 4 lists, Plaintiffs and TJ Members suffer from sleep deprivation and the anxiety it produces caused by remote DEW attacks.

259. On information and belief, as a result of their unfounded and unconstitutional inclusion in the TSDB's NIS/Handling Code 3 / 4 lists, Plaintiffs and TJ Members suffer from artificial tinnitus triggered by the constant location tracking inherent to the Targeting program.

260. **No private organization has the capacity to inflict widespread V2K, DEW or artificial tinnitus on the civilian population of the United States.**

<u>Unconstitutional Interference with Electronic Communications</u>

261. As a result of their unfounded and unconstitutional inclusion in the TSDB's NIS/Handling Code 3 / 4 lists, Plaintiffs, TJ Members and those similarly situated experience constant hacking of computers, emails, accounts and interference with phone and electronic communications constituting suspicionless seizure and searching of internet traffic on U.S. soil.

262. In the course of this surveillance, United States' communications are seized indiscriminately while they are in transit, in violation of Article III and the First, Fourth and Fourteenth Amendments of the Constitution of the United States.

263.     The constant interference with electronic communications like the ones that Plaintiffs and their counsel undergo constantly is similar to the situation currently the object of a judicial challenge in case *Wikimedia Foundation v. NSA, No. 1:15-cv-00662-TSE (D. Md.), No. 15-2560 (4th Cir.). Petition for a Writ of Certiorari filed on August 26, 2022.* Plaintiffs request that this Court take judicial notice of this case.

264.     In 2019, the New York Times published an article confirming that in only two years, the TSDB had increased to 5.5 million records of which 200,000 or 3.6% of them are United States citizens classified as "targets" while the NSA acknowledged that during that same year it was spying on 200,000 'targets' on US Soil.[10]

265.     On October 21, 2021, the USDOJ Office of Inspector General released an Audit Report[11] denouncing Defendant FBI's "was widespread non-compliance" with the factual accuracy review procedures ("Woods Procedures") required for applications under Section 702 of the Foreign Intelligence Surveillance Act ("FISA"), Section 702 (50 USC 1804(a)(4) and 50 USC 1801(h)) , to carry out electronic surveillance of U.S. Persons.[12] Plaintiffs request that this court take judicial notice of this Audit.

266.     Defendant FBI obtains FISA warrants for the covert collection of foreign intelligence information from foreign powers or agents of foreign powers suspected of espionage or terrorism.[13]

267.     FISA Court acknowledges it approves 99% of all wiretap applications.[14]

---

[10]     https://archive.ph/Mobhb

[11]     https://oig.justice.gov/sites/default/files/reports/21-129.pdf

[12]     https://archive.ph/6bHaO#selection-663.426-663.535

[13]     https://oig.justice.gov/sites/default/files/reports/21-129.pdf

[14]     https://www.npr.org/sections/thetwo-way/2013/10/15/234840282/fisa-court-we-approve-99-percent-of-wiretap-applications

268.    In November, 2021, the presiding judge of the FISA Court, James Boasberg, issued a ruling concluding that Defendant FBI "has been seriously and systematically abusing its warrantless electronic surveillance authority."

269.    A prior 2019 audit report had revealed that Defendant FBI had engaged in a "pattern of "*abuses and deficiencies in the FBI's FISA process.*"[15]

270.    "FISA orders can be used to surveil U.S. persons; and in some cases, the surveillance will foreseeably collect information about the individual's constitutionally protected activities."

271.    Traditional criminal search warrants that are granted in *ex parte* hearings but can potentially be subject to later court challenge, whereas FISA orders generally do not undergo scrutiny through subsequent adversarial proceedings.

272.    On   information   and   belief,   Defendant   FBI   effortlessly   obtains wiretap/surveillance warrants through the FISA Court since the procedure does not require the "probable cause" standard that Article III Courts demand in 18 USC 2518(3)(a) applications.

273.    Unlike warrants granted under 18 USC 2518(8)(d) where the government must inform the person object of the warrant that his or her communications were collected, FISA Court-issued warrants don't require Defendant FBI to ever notify the subject that his or her communications were collected unless government proceeding is brought against the person.

274.    As part of the 97% of individuals on the TSDB's grouped under the NIS/Handling Codes 3 / 4 categories who have no ties to terrorism, Plaintiffs have a right to know how many FISA warrants has the FBI obtained to listen in to their conversations and communications.

---

[15]    https://www.foxnews.com/politics/jordan-biggs-fbi-answers-fisa-violations-declassified-fisc-opinion

275.     On information and belief, any FISA warrant for the surveillance, search and/or seizure of Plaintiffs' communications and/or property that Defendant FBI obtained was done so in violation of law since the agency knows Plaintiffs have no ties to terrorism.

276.     On information and belief, any "Sneak and Peek" warrant that Defendant FBI has obtained and executed against Plaintiffs and TJ Members under Section 213 of the Patriot Act, is in violation of law since its agents know that Plaintiffs have no ties to terrorism.

277.     Just as the illegal actions denounced in the *Wikimedia* case, on information and belief Defendant FBI has relied on  the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1801, et seq., to carry out illegal surveillance on Plaintiffs, TJ Members and other equally-situated NIS' electronic communications.

278.     Under Section 702 of FISA, 50 U.S.C. § 1881a, defendant FBI can apply for the interception and Upstream Surveillance of Plaintiffs' and TJ Members' electronic communications without the need for any court to review or approve the individual targets of the surveillance based on their secret, unconstitutional inclusion in the TSDB's NIS/Handling Code 3 /4 categories.

279.     On information and belief, for years and devoid of probable cause that meets the Fourth Amendment's  mandates, Defendant FBI has illegally intercepted, recorded, listened in, stolen electronic communications and files from Plaintiffs and TJ Members under the pretext that their names appear in the TSDB.

280.     On information and belief, all warrants obtained and carried out against Plaintiffs' and TJ Members' electronic surveillance and secret searches and seizures are contrary to law and in open violation of their privacy rights. Defendants FBI and DHS are jointly liable for the damages the execution of any such illicit warrant caused Plaintiffs.

National Fusion Centers' Organized Stalking of TSDB-listed Individuals

281.   The National Network of Fusion Centers ("Fusion Centers") is under the purview of the DHS as a mechanism for counteracting terrorism.

282.   Although the Fusion Centers are deemed "state-owned and operated", Defendant FBI and Defendant DHS employees are assigned to work in them.

283.   The Fusion Centers Network have become the *Stasi* arm of Defendant DHS. They conduct surveillance, stalking, cyberstalking, and other clandestine and illegal operations against everyone in the TSDB: from KST to NIS.

284.   Defendant DHS controls and funds 100% of the Fusion Center Network operations.

285.   Defendants Mayorkas and Wainstein are responsible for the determinations regarding funding, creation and implementation of the policies, Standard Operating Procedures and tactics implemented at the Fusion Centers throughout the nation.

286.   Defendant FBI employees under the supervision and control of Defendant Wray and/or Kable directly work at Defendant DHS' Regional Fusion Center Network to implement and witness the unconstitutional, rogue and illegal organized stalking carried out against people listed in the TSDB.

287.   Defendant DHS' Fusion Centers' personnel and contractors have carried out illegal surveillance, search and seizures and organized stalking of Plaintiffs' and TJ Members' due to their inclusion on the TSDB's NIS/Handling Codes 3 / 4 category in violation of their Fourth Amendment rights.

288.   DHS' Fusion Centers' personnel and contractors have inflicted psychological torture on Plaintiffs and TJ Members in violation of their constitutional right to to be secure in

their persons, houses, papers, and effects and against unreasonable searches and seizures enshrined in the Fourth Amendment of the United States Constitution.

289.    Defendants Mayorkas and Wainstein create and mandate the unconstitutional policies and Standard Operating Procedures that the Fusion Centers implement to carry out Plaintiffs' and TJ Members' organized stalking. As such, they are personally liable for the illegal stalking and torture of the named individual Plaintiffs and TJ Members included in the TSDB's NIS/Handling Codes 3 / 4 lists, in violation of the Fourth Amendment that protects persons and their things from illegal searches and seizures, the Fifth and Sixth Amendments that prohibits the imposition of a sentence on a person without due process of law, the Eighth Amendment that prohibits the infliction of cruel and unusual punishments and the Fourteenth Amendment that guarantees the equal protection under the law.

290.    As a result of Defendant FBi's unfounded and unconstitutional inclusion in the TSDB as part of a largely secret, covert program, United States citizens and residents such as the named individual Plaintiffs and TJ Members suffer stigmatic government action.

291.    As a result of being unfounded and unconstitutionally included in the TSDB's NIS/Handling Codes 3 / 4 lists, Plaintiffs and TJ Members experience constant harassment known as gang stalking, organized stalking, or overt harassment (OH) that includes the use of organized stalkers to carry out the vandalizing of personal property; surreptitious entries into domicile; tampering with postal mail, computer, and telephone; spreading false and defamatory rumors about the individual in the neighborhood and work place to attain their virtual ostracizing from society.

292.    The illegal and unconstitutional organized/gang-stalking that Fusion Centers carry out against Plaintiffs and TJ Members occurs pursuant to Defendant Mayorkas' and

Wainstein's orders, authorization and/or supervision. These psychological operations follow the FBI manual crafted for the program's predecessor, COINTELPRO. The guiding policy of the program is that the [illegal] actions they carry out against the "target" be "*plausibly deniable*".

293.    When complaining to law enforcement agencies or physicians about the events and symptoms resulting their status as a TI,  some of the individual Plaintiffs and most of TJ Members have been illegally detained for "mental health observation" in deprivation of their liberty without due process, in violation of their rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

294.    As an example of the above, last year Plaintiff Hopson called Defendant FBI's offices to denounce the gang-stalking and DEW attacks she was suffering from. The first dispatcher hung up on her when she reported the crimes of gang stalking and DEW attacks. Upon calling a second time, a different dispatcher also dismissed her, told her she needed to "take her medication" and said "You people are all crazy". At this juncture, Plaintiff Hopson asked the dispatcher if she received any such calls frequently, she replied: "**<u>All the time</u>**".

295.    **Prior to being included in the TSDB, none of the individually named Plaintiffs or TJ Members experienced any of the events described above unless they were victims of the MK-ULTRA or COINTELPRO programs**.

296.    On information and belief, an estimated 200,000 individuals in the United States included in the TSDB's Handling Codes 3 / 4 categories every day undergo various forms of torture including DEW attacks, V2K and organized stalking in violation of the "Convention Against Torture ratified by the United States of America in 1994. All of it paid for with taxpayer's money.

An Illegal Targeting Program Based on Sex Discrimination

297.    Title VI of the Civil Rights Act provides that "a law enforcement agency must make sure that its policies and practices do not have the effect of discriminating against people because of their race, color, or national origin". This provision is extensive to federal officials under the *Bivens* action mechanism.

298.    The Department of Justice's most recent available national crime statistics (2020) reflect that an average of 73.48% of crimes are committed by men and 26.52% by women.

| Gender | % of all Offenses | All ages | 0 to 25 | 25 & older |
|--------|-------------------|----------|---------|------------|
| Males | 73.48% | 5,608,600 | 1,383,460 | 4,225,140 |
| Females | 26.52% | 2,023,870 | 527,810 | 1,496,050 |

299.    Conversely, on information and belief and based on TJ's data on the TI community, 66.6% of TIs are women. On information and belief, there is an inverse correlation in terms of gender between the actual crime perpetrators (a majority of men) and the people listed as NIS in the TSDB (a majority of women).

300.    On information and belief, Defendants apply the TSDB against women in a manner that is different from how they use it against men.

301.    TJ's data demonstrates that the illegal targeted individual program discriminates against single women who compose 66.6% of the TI community.

302.    This pattern demonstrates that the Targeted Individual program also constitutes a hate crime against women.

303.    Aside from creating, enabling and/or maintaining an unconstitutional, illegal and criminal torture program, Defendants Christopher Wray, Charles Kable Jr., Alejandro Mayorkas and Kenneth Wainstein are personally liable under *Bivens* for implementing regulations and policies that have resulted in the illegal discrimination against women that predominantly

occupy the ranks of targeted United States citizens and lawful residents within the TSDB's NIS/Handling Code 3 / 4 categories.

<u>An Illegal Targeting Program that Preys on the Disenfranchised</u>

304.    On information and belief, as a result of being included in the TSDB's NIS/Handling Code 3 / 4 lists, Plaintiffs and TJ Members have been blacklisted from employment, their professions and communities.

305.    TJ's statistics obtained within its membership reflect the following:

   a)  14% are homeless (National average is 0.5%);

   b)  35% are living with a relative or friend because they cannot afford to pay rent;

   c)  67% are unemployed (National average is 3.7%);

   d)  40% were indigent - having less than $100.00 in their possession. (Substantially below the poverty line).

306.    On information and belief, when exposing the abuses and deprivations delineated herein, Plaintiffs and TJ Members have been deprived of their constitutional rights without due process of law or assistance of counsel.

307.    Under the direction and authority of Mayorkas, Wainstein and their predecessors, state, tribal, and federal law enforcement have enabled and facilitated the incarceration and/or hospitalization of some Plaintiffs, TJ Members and other individuals equally situated to them.

<b>V. CLAIMS FOR RELIEF</b>

<u>Claims common to all Plaintiffs</u>

308.    The foregoing allegations are realleged and incorporated herein.

309.    Plaintiffs' and TJ Members' inclusion in the TSDB violates the First Amendment.

310.    Plaintiffs' and TJ Members' inclusion in the TSDB and the consequences thereof violate the Fourth Amendment's prohibition against illegal searches and seizures.

311.    Plaintiffs' and TJ Members' inclusion in the TSDB and the consequences thereof violate their substantive and procedural due process rights contained in the Fifth, Sixth and Fourteenth Amendments by depriving them of their property and freedom without due process of law.

312.    Plaintiffs' and TJ Members' inclusion in the TSDB and the consequences thereof violate the accepted values of human dignity, civilized society, and human decency embodied in the Eighth Amendment prohibition against cruel and unusual punishment.

313.    Plaintiffs' and TJ Members' inclusion in the TSDB and the consequences thereof violate their fundamental rights to privacy embodied in the Fourth and Fourteenth Amendment.

## **FIRST CAUSE OF ACTION:**

### Writ of Mandamus

314.    The foregoing allegations are realleged and incorporated herein.

315.    Defendants' actions violate the President's constitutional duty that his cabinet members are compelled to follow. To wit: that of "tak[ing] Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3.

316.    Plaintiffs request that this Court direct the Defendants to purge their names as well as those in TJ Members from its TSDB's NIS/Handling Code 3 / 4 categories.

317.    Plaintiffs request that this Court enter judgment as follows:

318.    Finding that Defendants' joint illegal interpretation, handling and execution of their ministerial duties as they pertain to the TSDB's NIS/Handling Code 3 /4 lists have resulted in the unconstitutional deprivation of Plaintiffs' TJ Members' liberty and property interests

without due process of law in violation of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution through their secret nomination process, inclusion and maintenance thereto despite lack of particularized derogatory information tending to demonstrate they are a KST.

319.    Finding that Defendants engaged unconstitutional enabling and implementation of an illegal targeting and surveillance program that preys on, tortures and results in the deaths of United States citizens and lawful residents in violation of the constitutionally protected rights delineated herein.

320.    Plaintiffs request that the Court order defendants Wray and Kable to adhere to constitutional and human rights precepts inherent to their position and which they vowed to adhere to, and bring to an end the unconstitutional enabling and implementation of an illegal targeting program based on age and sex discrimination targeting of middle-aged women.

321.    Holding Defendants jointly liable for the enabling and implementing of an ongoing crime against humanity of a highly illegal targeting program that preys on, tortures and prompts the death of innocent civilians throughout the world included under TSDB's NIS/Handling Code 3 / 4  categories and the consequences thereof, in violation of the United Nations' Convention 1753 against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, ratified by the United States of America in 1994.

322.    Ordering defendants to immediately remove Plaintiffs' and TJ Members' names from the TSDB and recall all versions that contain their names and have been disseminated among federal, local, tribal, and foreign governments, private entities and persons.

323.    Awarding Plaintiffs counsel fees and costs pursuant to the All Writs and Declaratory Judgment Act.

## SECOND CAUSE OF ACTION:

### Administrative Procedures Act

324.    The foregoing allegations are realleged and incorporated herein.

325.    Plaintiffs and TJ Members have suffered harm as a result of Defendant FBI's act of including them in the TSDB.

326.     Plaintiffs and TJ Members have been adversely impacted and aggrieved by FBI's agency action of including them in the TSDB that resulted in the detrimental social, psychological and physical consequences attendant thereto and resulting therefrom.

327.    By denying Plaintiffs and TJ Members request for disclosure of their inclusion in the TSDB, defendants FBI and DHS divest Plaintiffs and TJ Members of their constitutionally protected right to petition a court of competent jurisdiction for relief.

328.    Defendant FBI and  Defendant DHS actions violate Sections 702 and 706 of the APA, 5 U.S.C. §§ 702, 706, by creating, promulgating, implementing, and relying upon the TSDB in open violation of Plaintiffs' and TJ Members' Fifth and Sixth Amendment rights to Due Process of Law.

329.    Defendants' violations under APA are continuous and uninterrupted to the extent that innocent United States citizens and residents continue to be included in the TSDB without legal grounds therefor.

## THIRD CAUSE OF ACTION:

### Declaratory Judgment under the Administrative Procedures Act,
### the Privacy Act and the Constitution of the United States

330.    The foregoing allegations are realleged and incorporated herein.

331.    The United States District Court has jurisdiction to adjudicate this petition to

59

enter declaratory judgment holding the NIS subcategory of the TSDB as well as the TSDB nominating and inclusion procedures in it as unconstitutional on the grounds set forth below.

332.   Defendants have violated the APA by promulgating, implementing, relying upon and circulating the TSDB's NIS/Handling Code 3 / 4 lists to government and non-government entities and persons in violation of the Privacy Act, 5 USC § 502(a), causing substantial and irreparable damages to the named Plaintiffs and TJ's members.

333.   The Handling Codes 3 / 4 or "non-investigative subjects" parts of the TSDB constitute an unconstitutional blacklisting of American citizens and residents by including people who are not known or suspected terrorists, which in turn negatively and indefinitely impacts their lives.

334.   The standards for inclusion in the TSDB's NIS/Handling Codes 3 / 4  lists are overly broad and vague and the information they rely on is not accurate or credible. The manner in which the NIS subcategory in it is used, is not consistent with the presumption of innocence and the right to a hearing before punishment.

335.   The availability of the blacklisting of people through the TSDB by private nominating persons and corporations allows for its abuse for personal or commercial revenge purposes in violation of individuals' constitutionally-protected rights.

336.   The persistent and permanent languishing of individuals on the TSDB's NIS/Handling Codes 3 / 4  subcategories despite the lack of particularized derogatory information tying them to acts of terrorism and/or a reasonable suspicion that they are "a known or suspected terrorist ('KST')" constitutes an unconstitutional deprivation of their property and liberty rights, destroying their lives.

337.   The absence of notice prior to inclusion and/or a viable mechanism to discover

one's inclusion on the TSDB, correct errors and obtain removal after being included on it for improper or illegal purposes is a violation of Plaintiff's rights to substantive and procedural due process. There is no notice nor meaningful way to contest a person's designation as a "potential terrorist" and ensure that the United States government, and all other users of the information, removes or corrects inaccurate records.

Discrimination as an Unconstitutional Motive

338.    The TSDB's NIS/Handling Codes 3 / 4 subcategories demonstrate Defendants' illicit motives behind the nomination and inclusion of individuals in it.

339.    Beyond the illegal motive of human experimentation lies the sex discrimination that the disproportionate amount of women in the experiment reflect.

340.    Even though national crime statistics reflect that an average of 82% of crimes are carried out by men, an average of 66.6% of TIs are single women.

341.    On information and belief, this inverse correlation demonstrates that the Target Program constitutes a massive hate crime against women in violation of the Conspiracy Against Rights, 18 U.S.C. § 241 and The Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249.

Discrimination in Violation of the First Amendment

342.    Inclusion on the TSDB's NIS/Handling Codes 3/4 subcategories, on information and belief, is based on unconstitutional discrimination for political beliefs and affiliation. On information and belief, victims of the illegal torture under the Targeted Individual program are chosen in violation of the First Amendment as TJ's membership disproportionately identifies with conservative/republican beliefs. TJ surveys reflect the following:

a) TJ Members are 5.8 times more likely to be Republican than Democrat;

61

b) 52% of TJ Members vote Republican;

c) 9% of TJ Members vote Democrat;

d) 17% will not vote/are fed up with the system;

e) 22% are undecided/independent voters.

Discrimination on Economic Grounds

343.    Inclusion on the TSDB's NIS/Handling Codes 3/4 subcategories, on information and belief, promotes the economic disparity that is destabilizing to the country.

344.    The theft and vandalism inherent to the Program drain the scant financial resources  most TIs have been left with.

345.    Plaintiffs, TJ Members, and others situated like them find themselves constantly having to spend their savings or limited income in fixing or purchasing basic necessary items and objects to replace stolen or broken ones.

346.    On information and belief, the majority of TIs are mostly low income and disadvantaged because the program/apparatus is designed to push them into a downward economic spiral by interfering with their employment opportunities and depriving them of their property rights without just compensation or due process of law.

Unreliability of the TSDB NIS/Handling Code 3 /4 Data

347.    TSDB records are not appropriately generated, updated or removed as required by the Constitution.

348.    The absence of a viable mechanism to discover a person's inclusion on the TSDB's NIS/Handling Codes 3-4 categories, correct errors and remove his or her name after being included in it for improper or illegal purposes is a violation of due process. There must be

62

a meaningful way to contest a person's designation as a potential terrorist and ensure that the U.S. government, and all other users of the information, removes or corrects inaccurate records.

349.    As implemented, the government's TSDB's NIS/Handling Codes 3 / 4 categories amount to an unchecked, illegal and unconstitutional exercise of power over American citizens and residents.

350.    The availability of the blacklisting mechanism provided by the TSDB's NIS/Handling Codes 3-4 categories by private nominating persons and corporations allows for its abuse for personal or commercial revenge purposes and violates individuals' constitutionally-protected property, due process and liberty rights.

351.    For all the reasons stated herein, Plaintiffs request that this Court enter Declaratory Judgment declaring the TSDB's NIS/Handling Codes 3-4 categories and the human experimentation program on Targeted Individuals stemming from it repugnant to the United States Constitution as it violates the following:

> a)   First, Fourth, Fifth, Sixth, Amendments of the Constitution of the United States by punishing its victims for the exercise of Free Speech, conducting illegal searches and seizures of their person and things, and depriving them of property and liberty without due process;
>
> b) Eighth Amendment as it constitutes totalitarian cruel and unusual punishment;
>
> c)   Fourteenth Amendment as the experimentation program disproportionately targets women and conservatives; and
>
> d)   The United Nations' Convention 1753 against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, ratified by the United States of America in 1994.

352.    Plaintiffs are entitled to the recovery of attorney's fees and costs under 5 § USC 552(a).

## FOURTH CAUSE OF ACTION

### Permanent Injunction

353.    The foregoing allegations are realleged and incorporated herein.

354.    Plaintiffs, TJ Members and the individuals similarly situated are in immediate danger of sustaining direct and serious injuries as the result of the official conduct denounced in this complaint.

355.    Plaintiffs request that this Court issue a Permanent Injunction ordering Defendants to:

a)    Immediately eliminate plaintiffs' and TJ Members' names from the TSDB's NIS/Handling Codes 3-4 categories and ban defendants from including them in any other secret catalog, list or index or circumvent the Court's order in any way;

b)    Recall and recover the over 18,000 disseminations of these catalogs, lists or indexes to law enforcement, private companies, individuals and entities that contained Plaintiff's names and personal identifiers;

c)    Prohibit Defendants devising, perpetrating and enabling the surveillance, organized stalking and psychological torture against Plaintiffs and TJ Members through DHS' Fusion Centers, contractors such as Infragard, Citizen Corps and/or any other person or entity defendants concoct, collude with or hire for those purposes;

d)    Permanently enjoin Defendants from continuing making fraudulent FISA applications and/or carry out warrantless surveillance of their personal belongings

and electronic communications devoid of probable cause as required by the Fourth Amendment;

e)  Permanently enjoin Defendants from creating another experimentation program or list to include Plaintiffs or TJ Members listed on the TSDB's NIS/Handling Codes 3 / 4 categories;

g)   Order Defendant FBI to immediately produce the entire NIS/Handling Code 3/Handling Code 3 sublists of the TSDB and grant Plaintiffs and TJ Members the right to examine when and why they were included in the TSDB;

h)  Hold Defendants jointly liable for Plaintiffs' damages and order them to pay them the amounts alleged for each one as specified in the paragraphs above incorporated herein;

I)  Compel the Defendants to fund the creation of a Court monitoring system to ensure full compliance with the Court's orders regarding the elimination of any list within the TSDB that contains individuals not meeting the "reasonable suspicion" standard and to ensure that there shall exist no illegal human experimentation program such as the Targeted Individuals program persists.

**FIFTH CAUSE OF ACTION**

<u>Privacy Act Violations</u>

356.    The foregoing allegations are realleged and incorporated herein.

357.     Under Freedom of Information/Privacy Acts, Defendant FBI and Defendant DHS has twenty working days to respond to a request. 5 U.S.C. § 552(a)(6)(A)(i). If there are "unusual circumstances," an agency may extend the time limit by no more than ten working

days. Id. § 552(a)(6)(B)(i). More than thirty days have passed since most Plaintiffs filed the Request. Thus, these statutory time periods have elapsed.  The urgency of the injunction requires us to move forward.

358.    To date, neither Defendant FBI nor Defendant DHS have released responsive records to Plaintiffs' requests nor have they justified their failure to do so.

359.    Defendant FBI and Defendant DHS continue to wrongfully withhold the requested records from Plaintiffs. Defendants failure to make a reasonable effort to search for records responsive to the Request violates the FOIA, 5 U.S.C. § 552(a)(3), and their corresponding regulations.

360.    Defendants' failure to promptly make available the records sought by the request violates the FOIA, 5 U.S.C. § 552(a)(3)(A), (a)(6)(A), and Defendant's corresponding regulations.

361.    Defendants' failure to process Plaintiffs' request expeditiously and as soon as practicable violates the FOIA, 5 U.S.C. § 552(a)(6)(E), and their corresponding regulations.

362.    Defendants FBI and DHS are liable to  plaintiffs for counsel fees and costs incurred in the filing of this claim pursuant to 5 USC § 552(a)(4)(E)(i).

## SIXTH CAUSE OF ACTION:

### Plaintiffs' Individual Damages

363.    The foregoing allegations are realleged and incorporated herein.

364.    Defendants Wray, Kable Jr., Mayorkas and Wainstein are jointly liable to Plaintiffs in their personal capacity for the damages set forth below resulting from their reckless deprivation of Plaintiffs' civil and human rights.

365.    Defendants are federal public officials acting under color of federal authority that have disregarded their duty to adhere to the laws and Constitution, depriving the individual Plaintiffs of their Civil Rights. As such, they are liable to Plaintiffs under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and Plaintiffs' civil rights for violating their rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution as well as the Convention Against Torture.

366.    Defendants Wray, Kable Jr., Mayorkas and Wainstein are jointly and severally liable in their personal capacities for the entire amount of damages alleged herein, regardless of whether the conduct of one directly caused more or less injury compared to that of another, because they a) have acted together with a common purpose resulting in responsibility for the common injury by including Plaintiffs' names in the TSDB's NIS/Handling Codes 3 / 4 categories even though they are not associated to acts of terrorism; b) they have intentionally disregarded Plaintiffs' constitutional, civil and human rights; and c) they have perpetrated in an uninterrupted manner the conduct and illicit acts of their predecessors.

367.    The injury or threat of injury to Plaintiffs is actual, concrete, extraordinary and particularized. Inasmuch as the continuous and uninterrupted targeting damages directly correlate with Defendants' decision to keep Plaintiffs listed in the TSDB's NIS/Handling Codes 3 / 4 categories, the former are also jointly liable for the real and immediate damages resulting from DEW attacks alleged herein.

<u>Plaintiff Plaintiff Leonid Ber</u>

368.    The foregoing allegations are realleged and incorporated herein.

369.    Plaintiff Plaintiff Leonid Ber came to the United States in 2003 from the former Soviet Union. He's a naturalized citizen of the United States.

67

370.    On or around 2019, Plaintiff Ber realized he was a TI when he began having symptoms of V2K and DEW attacks.

371.    Defendant FBI's TSC nominated and included Plaintiff Ber in the TSDB devoid of supporting 'particularized derogatory information' linking him to terrorism.

372.    Plaintiff Ber was nominated and included in the TSDB devoid of supporting 'particularized derogatory information' about him; without being given notice or an opportunity to rebut his nomination.

373.    Defendant FBI failed to corroborate that Plaintiff Ber was not associated to terrorist activity prior to including him in the TSDB as NIS/Handling Code 3 / 4 lists.

374.    Defendant FBI does not possess and has never corroborated having any particularized derogatory information linking Plaintiff Ber to any act of terrorism.

375.    Plaintiff Ber has never been convicted of any crime.

376.    Defendant FBI and Defendant DHS replied to Plaintiff Ber's Privacy Act requests but rendered no information on his inclusion in the TSDB. The only document produced was a copy of a complaint Plaintiff Ber had himself electronically filed to denounce the DEW attacks that he sustained.

377.    Plaintiff Ber's inclusion in the TSDB has subjected him to Defendants' physical and electronic surveillance and organized stalking in violation of his rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and the Convention Against Torture.

378.    Plaintiff Ber sought the assistance of his Congressional District representative, Senator Tammy Duckworth, to investigate the DEW attacks perpetrated against him. In reply to the inquiry Sen. Duckworth made to the FBI regarding the DEW attacks that Plaintiff Ber is a

victim of, Defendant FBI on January 21, 2021 responded that the agency could not investigate without "specific facts" that "indicate that a violation of federal law within our investigative jurisdiction has occurred." See **Exhibit 6**.

379.    Defendant FBI did not comply with its statutory obligation to investigate Plaintiff Ber's claims that tend to demonstrate *prima facie* violations to the Convention Against Torture occurring within U.S. soil. Defendant FBI's dereliction of duty by refusing to investigate and prosecute the perpetrators of DEW attacks occurring on American soil increases Plaintiff Ber's damages as the attacks on him remain unrestricted.

380.    Since 2019, Plaintiff Ber has experienced constant. disabling V2K symptoms attacks that have severely interfered with his daily life, personal interactions, capacity to work and live in peace. He estimates the damages he has suffered as a result of V2K in an amount exceeding FIFTY MILLION DOLLARS ($50,000,000.00).

381.    As a result of Plaintiff Ber's inclusion in the TSDB, he has undergone painful and disabling DEW on a daily basis to various parts of his body, inflicting on him severe and debilitating sleep deprivation, anxiety, permanent damage, and physical and mental pain and suffering. During the five years that Plaintiff Ber has suffered constant DEW attacks perpetrated from satellites and cell towers, he estimates having suffered physical and mental pain and suffering valued in FIFTEEN MILLION DOLLARS ($15,000,000).

382.    As a direct consequence of the DEW attacks Plaintiff Ber has sustained and continues to undergo on a daily basis, he has been diagnosed with permanent brain injuries and Havana Syndrome. The permanent physical damages and mental pain and suffering that the Havana Syndrome condition causes him are estimated in an amount no less than FIFTY MILLION DOLLARS ($50,000,000.00).

383.    Plaintiff Ber's  inclusion in the TSDB has subjected him to Defendants' physical and electronic surveillance and organized stalking in violation of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and the Convention Against Torture, resulting in egregious mental anguish, anxiety, and suffering estimated in an amount no less than TEN MILLION DOLLARS ($10,000,000).

384.    Plaintiff Ber asks that this Court hold Defendants Wray, Kable Jr, Mayorkas and Wainstein jointly liable for his damages totaling ONE HUNDRED TWENTY-FIVE MILLION DOLLARS ($125,000,000) and in light of their intentional, wanton and willful misconduct in the deprivation of Plaintiffs' civil rights, impose on them the payment of punitive damages calculated at THREE HUNDRED SEVENTY-FIVE MILLION DOLLARS ($375,000,000).

385.    Plaintiff Ber requests that Defendant FBI and Defendant DHS be held jointly liable for the negative social, professional and personal repercussions he sustained as a result of their illegal disclosure of his inclusion in the TSDB in violation of the Privacy Act and the suffering, anxiety and loss this has caused him. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agencies and the prejudice they caused.

386.    Plaintiff Ber specifically requests that this Court order Defendants to remove his name from the TSDB's NIS/Handling Codes 3 / 4 categories, recall all lists containing his name, and instruct them to abstain from including his name in any other illegal database used to carry out human torture, experimentation and/or any other improper purpose.

387.    Plaintiff Ber requests that the Court hold all Defendants to be jointly liable for the payment of reasonable attorney's fees and costs under 28 U.S.C. § 2412,  5 USC § 552(a)(4)

(E)(i) and *Bivens*.

<u>Plaintiff Timothy Shelley</u>

388.     The foregoing allegations are realleged and incorporated herein.

389.     Plaintiff Shelley is an lawyer in good standing in the State of Delaware and the District of Columbia.

390.     On or around 2016, Plaintiff Shelley realized he had become a targeted individual. In hindsight, he believes he has been a Target for decades.

391.     Plaintiff Shelley was nominated and included in the TSDB devoid of supporting 'particularized derogatory information' linking him to terrorist activity; without being given any notice or opportunity to rebut; and based on his First Amendment-protected activities.

392.     Defendant FBI's and Defendant DHS' reply to Plaintiff Shelley's Privacy Act requests provided no information about his inclusion in the TSDB.

393.     Plaintiff Shelley's inclusion in the TSDB resulted in illegal break-ins to his home, physical and electronic surveillance, and organized stalking.  For over two decades, he has undergone a plethora of abuses that include drugging, kidnapping, sexual battery, false imprisonment, job-blocking, petty theft and and minor cyber-attacks. in violation of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and the Convention Against Torture. The damages he has suffered as a result of the organized stalking exceed  FIFTY-FOUR MILLION DOLLARS ($54,000,000).

394.     On or around September 2016, Plaintiff Shelley began hearing constant Voice-to-Skull (V2K), and showed symptoms of forced speech, severely impairing his daily activities and producing significant mental pain and suffering. He estimates these damages in SEVENTY MILLION DOLLARS ($70,000,000).

395.     On or around September 2016, Plaintiff Shelley began suffering from painful and disabling Directed Energy Weapons (DEW) on a daily basis to various parts of his body, including the microwaving of genitals and lower digestive tract. These physical torture and damages are estimated in an amount no less than TWENTY-ONE MILLION DOLLARS ($21,000,000.00).

396.     The constant DEW attacks perpetrated against him since 2016 have caused Plaintiff Shelley permanent brain and physical injuries estimated at TWENTY MILLION DOLLARS ($20,000,000.00).

397.     Plaintiff Shelley requests that this Court hold Defendants Wray, Kable, Mayorkas and Wainstein jointly liable for his damages exceeding ONE HUNDRED SIXTY-FIVE MILLION DOLLARS ($165,000,000). Given the malicious intent behind his targeting, experimentation, torture and suffering, Plaintiff Shelley also demands that the court hold Defendants Wray, Kable Jr, Mayorkas and Wainstein jointly liable in the payment of punitive damages in an amount no less than FOUR HUNDRED NINETY-FIVE MILLION DOLLARS ($495,000,000).

398.     Plaintiff Shelley requests that FBI and DHS be ordered to pay him damages for the illegal disclosure of his inclusion in the TSDB in violation of the Privacy Act, with the social, professional and personal repercussions, suffering, anxiety and loss that this has caused him. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

399.     Plaintiff Shelley requests that the Court impose on Defendants joint liability in

the payment of reasonable attorney's fees and costs under 28 U.S.C. § 2412, 5 USC § 552(a)(4) (E)(i) and *Bivens*.

400.    Plaintiff Shelley specifically requests that this Court order Defendants to remove his name from the TSDB's NIS/Handling Codes 3 / 4 categories, recall all lists containing his name, and instruct them to abstain from including his name in any other illegal database used to carry out human torture, experimentation and/or any other improper purpose.

Plaintiff Karen Stewart

401.    The foregoing allegations are realleged and incorporated herein.

402.    Plaintiff Stewart was nominated and included in the TSDB in revenge for being a whistleblower at the National Security Agency. Her nomination was entirely devoid of supporting 'particularized derogatory information' linking her to terrorist activity. Defendant FBI did not give her any notice or opportunity to rebut her nomination.

403.    Defendant FBI and Defendant DHS replied to the Privacy Act requests that Plaintiff Stewart sent each agency in December, 2022 and January, 2023. The agencies' replies did not provide any of the information requested regarding her inclusion in the TSDB.

404.    On or around 2005, Plaintiff Stewart began to experience threats, defamation, stalking and harassment. An acquaintance working for law enforcement personally confirmed to her that since her name appeared on the TSDB, he could not associate with her.

405.    In 2006 Plaintiff Stewart started experiencing break-ins, thefts, wiretap of home and phones. When she moved to Florida in 2014, she continued to be heavily stalked and harassed by neighbors. Since its inception, the organized stalking perpetrated against Plaintiff Stewart has not stopped.

406.    Part of the organized stalking Plaintiff Stewart has had to undergo is the forced

hospitalization for mental evaluation and attempts at criminal entrapment.

407. Plaintiff Stewart's inclusion in the TSDB prompted illegal break-ins to her home, vandalizing of her property, physical and electronic surveillance, and organized stalking for over two decades in violation of her rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and the Convention Against Torture. Plaintiff Stewart estimates her damages from organized stalking since 2005 in an amount no less than EIGHTEEN MILLION DOLLARS ($18,000,000).

408. On or around 2016, Plaintiff Stewart began suffering from constant, painful and disabling Directed Energy Weapons (DEW) attacks on a daily basis to various parts of her body that caused her severe pain and burns. The physical torture and damages she has suffered as a result of DEW attacks are estimated in an amount no less than TWENTY-ONE MILLION DOLLARS ($21,000,000).

409. The constant DEW attacks perpetrated against Plaintiff Stewart since 2016 have caused her permanent brain and physical injuries as she has developed symptoms similar to those associated to Havana Syndrome. She estimates these debilitating and permanent damages in excess of TWENTY MILLION DOLLARS ($20,000,000).

410. Plaintiff Stewart requests that this Court hold Defendants Wray, Kable, Mayorkas and Wainstein jointly and severally liable for her damages estimated in FIFTY-NINE MILLION DOLLARS ($59,000,000).

411. Plaintiff Stewart requests that in light of the malicious intent behind her targeting, experimentation, torture and suffering, the Court hold Defendants Wray, Kable Jr, Mayorkas and Wainstein jointly liable to her for punitive damages for the amount of ONE HUNDRED SEVENTY-SEVEN MILLION DOLLARS ($177,000,000).

412.    Plaintiff Stewart also requests that Defendant FBI and Defendant DHS be ordered to pay her damages for the illegal disclosure of her inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that this has caused her. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information about Plaintiff Stewart shared outside of the agency, to be calculated when Defendants provide the evidence of the extent of the disclosure.

413.    Plaintiff Stewart requests that the court hold Defendants jointly liable for the payment of  reasonable attorney's fees and costs under  28 U.S.C. § 2412,  5 USC § 552(a)(4) (E)(i) and *Bivens*.

414.    Plaintiff Stewart further requests that this Court order Defendants to remove her name from the TSDB and instruct them to abstain from including her name in any other secret database used to carry out human torture and experimentation or any other improper purpose.

<u>Winter Calvert</u>

415.    The foregoing  allegations are realleged and incorporated herein.

416.    Plaintiff Calvert was nominated and included in the TSDB devoid of supporting 'particularized derogatory information' about him; without having being given any notice or opportunity to rebut; and based on his First Amendment-protected activities.

417.    Defendant FBI does not possess and has never corroborated particularized derogatory information linking Plaintiff Mr. Calvert to any act of terrorism.

418.    Plaintiff Calvert has never been convicted of any crime.

419.    On or around December 2016, Mr. Calvert sustained a medical emergency while at his mother's house. While laying on the floor suffering from what he later learned were severe

blood clots, two deputy sheriffs of the Brazoria County didn't allow the ambulance to drive up right away to the driveway to take him to a hospital.

420.   While Plaintiff Mr. Calvert laid on the floor of his mother's house, in severe pain and on the brink of death, two Brazoria County Deputy Sheriffs entered the premises. Both deputy sheriffs asserted that they could not allow anyone into the premises until they inspected them thoroughly since they had to "secure the area" because they had been told that a "suspected terrorist" lived there.

421.   As a result of the sheriffs' directives, it took more than an hour for Plaintiff Calvert to receive emergency medical attention, almost costing him his life. The only persons that lived in that property were Plaintiff Mr. Calvert and his 87-year old mother who is a retired attorney licensed in the state of Texas.

422.   Plaintiff Calvert's inclusion in the TSDB subjected him to Defendants' illegal break-ins to his home, physical and electronic surveillance and organized stalking since at least 2011 in violation of his rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and the Convention Against Torture and causing him egregious mental anguish, anxiety, and suffering.

423.   As a result of Plaintiff Calvert's illicit inclusion in the TSDB, since at least 2016 he has undergone painful and disabling DEW on a daily basis to various parts of his body, microwave burns, blood clots, inflicting on him severe and debilitating sleep deprivation, anxiety and physical and mental pain and suffering.

424.   Despite his impeccable professional qualifications, Mr. Calvert's inclusion in the TSDB and the organized stalking directed at him forced him to be unemployed during two years and eight months beginning in 2013.

425.    Plaintiff Calvert's inclusion in the TSDB subjected him since 2011 to illegal break-ins to his home, vandalizing of his property, physical and electronic surveillance, and organized stalking, electronic interferences and hacking, in violation of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the Convention Against Torture resulting in damages estimated in an amount no less than TWELVE MILLION DOLLARS ($12,000,000).

426.    Since 2016, Plaintiff Calvert's has suffered constant DEW attacks perpetrated from satellites and cell towers valued in TWENTY-ONE MILLION DOLLARS ($21,000,000).

427.    Plaintiff Calvert has sustained permanent brain injuries and developed a permanent physical condition similar to Havana Syndrome. The permanent physical damages and mental pain and suffering this condition causes him are estimated in an amount no less than TWENTY MILLION DOLLARS ($20,000,000).

428.    Aside from the payment of the damages amounting to FIFTY-THREE MILLION DOLLARS ($53,000,000) Plaintiff Calvert requests that in light of the malicious intent behind his targeting, experimentation, torture and suffering, the Court hold Defendants Wray, Kable Jr, Mayorkas and Wainstein jointly liable to him for punitive damages for the  amount  of ONE HUNDRED FIFTY-NINE MILLION DOLLARS ($159,000,000).

429.    Plaintiff Calvert also requests that FBI and DHS be ordered to pay him damages for the illegal disclosure of his inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that it caused him. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

430.    Plaintiff Calvert requests that the court hold Defendants jointly liable in the payment of reasonable attorney's fees and costs under  28 U.S.C. § 2412,  5 USC § 552(a)(4)(E)(i) and *Bivens*.

431.    Plaintiff Calvert specifically requests that this Court order Defendants to remove his name from the TSDB's NIS/Handling Codes 3 / 4 categories, recall all lists containing his name, and instruct them to abstain from including his name in any other illegal database used to carry out human torture, experimentation and/or any other improper purpose.

<u>Plaintiff Armondo Delatorre, Berta Jasmin Delatorre and J.D.</u>

432.    The foregoing allegations are realleged and incorporated herein.

433.    As a result of Defendants' illegally including Plaintiffs Armando and Jasmin Delatorre and their minor daughter J.D. as non-investigative subjects under Handling code 3 or 4 in the TSDB since at least 2019, they have sustained substantial damages deriving from the unconstitutional deprivations of their rights protected under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Convention Against Torture.

434.    As a result of being targeted, Plaintiffs Armando and Berta Jasmin Delatorre have suffered illegal break-ins to their home, physical and electronic surveillance and organized stalking since 2018. Rogue stalkers follow Mr. Delatorre  in packs at any given time, seven days a week.

435.     The damages Plaintiff Armando Delatorre and Berta Jasmin have sustained as a result of Defendants' joint liability stemming from the unconstitutional and illegal organized stalking part of their targeting is estimated in an amount no less than FIVE MILLION DOLLARS ($5,000,000) each, for a total of TEN MILLION DOLLARS ($10,000,000).

436.    As a result of being targeted since 2018, Plaintiff Berta Jasmin suffers from intolerable V2K that almost cost her her life. As a result of the V2K, she has sustained damages amounting to FIFTY MILLION DOLLARS ($50,000,000)

437.    The physical pain and suffering that Plaintiffs Armando and Berta Jasmin Delatorre have sustained  as a result of Defendants' joint liability stemming from the DEW attacks they have suffered since 2018 as a result of their targeting is estimated in an amount no less than FIFTEEN MILLION DOLLARS ($15,000,000) each, for a total of THIRTY MILLION DOLLARS ($24,000,000).

438.    Both  Plaintiffs Armando and Berta Jasmin Delatorre have sustained  permanent brain damage that has caused them the condition known as Havana Syndrome as a result of Defendants' joint liability stemming from the DEW attacks they have suffered since 2018 as a result of their targeting. The permanent physical damages for each of them is estimated in TWENTY MILLION DOLLARS ($20,000,000) for a total of FORTY MILLION DOLLARS ($40,000,000).

439.    Armando and Berta Jasmin's daughter, J.D., suffers from V2K since at least August, 2022. The permanent damages this torture has caused and will continue to cause her developing brain is unknown at this time. The suffering, fear and anguish the V2K has caused her is estimated in an amount no less than TEN MILLION DOLLARS ($10,000,000).

440.    Aside from the payment of the damages alleged above, Plaintiffs Delatorre request that in light of the malicious intent behind their targeting, experimentation, torture and suffering, the Court hold Defendants Wray, Kable Jr, Mayorkas and Wainstein  jointly liable to them for a reasonable amount in punitive damages in an amount estimated at FOUR HUNDRED EIGHTY MILLION DOLLARS ($480,000,000).

441.    Plaintiffs Armondo and Berta Jasmin Delatorre also request that Defendant FBI and Defendant DHS be held jointly liable for the payment of the damages they have sustained for the illegal disclosure of their inclusion in the TSDB that has them caused considerable and irreparable social, professional and personal repercussions, suffering, anxiety and loss. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) each per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

442.    Plaintiffs Armondo, Berta Jasmin Delatorre and J.D. request that the court hold Defendants jointly liable in the payment of reasonable attorney's fees and costs under  28 U.S.C. § 2412,  5 USC § 552(a)(4)(E)(i) and *Bivens*.

443.    Plaintiffs Delatorre specifically request that this Court order Defendants to remove their names as well as that of their daughter J.D. from the TSDB and instruct Defendants to abstain from including them in any other illegal database used to carry out human torture and experimentation or any other improper purpose.

<u>Deborah Mahanger and Daughter L. M.</u>

444.    The foregoing allegations are realleged and incorporated herein.

445.    On or around 2009, Plaintiff Mahanger realized she had become a targeted individual.

446.    Plaintiff Mahanger's nomination was entirely devoid of supporting 'particularized derogatory information' linking her to terrorist activity. She was not given any notice or opportunity to rebut her nomination.

447.    As a result of Defendants' illegally including Plaintiff Mahanger as non-

investigative subject under Handling code 3 or 4 in the TSDB since at least 2009, and her daughter L.M. added to the TSDB sometime after birth, have sustained substantial damages deriving from the unconstitutional deprivations of their rights protected under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and the Convention Against Torture.

448.   Defendants FBI's and DHS' reply to Plaintiff Mahanger Privacy Act requests provided no information about their inclusion in the TSDB.

449.   Plaintiff Mahanger's inclusion in the TSDB subjected her since 2009 to illegal break-ins to her home, vandalizing of her property, physical and electronic surveillance, and organized stalking for over two decades consisting of a plethora of abuses including job-blocking, petty theft, electronic interferences and hacking. Both Plaintiff Mahanger and her daughter L. M. have suffered each damages resulting form organized torture estimated in an amount no less than THIRTEEN MILLION DOLLARS ($13,000,000) and FIVE MILLION DOLLARS ($5,000,000), respectively.

450.   Plaintiff Mahanger and her daughter L. M. suffer from painful and disabling Directed Energy Weapons (DEW).  These physical torture and damages are estimated in an amount no less than THIRTY-SIX MILLION DOLLARS ($36,000,000) and FIFTEEN MILLION DOLLARS ($15,000,000), respectively.

451.   The constant DEW attacks perpetrated against Plaintiff Mahanger and her daughter L.M. also include remote neural monitoring and subliminal messaging have caused them the condition known as Havana Syndrome consisting of permanent brain and physical injuries estimated at TWENTY MILLION DOLLARS ($20,000,000) each.

452.   Plaintiff Mahanger suffers from V2K since at least 2017.  The suffering and

anguish the V2K has caused her is estimated in an amount no less than FIFTY MILLION DOLLARS ($50,000,000).

453.     Aside from the payment of the damages amounting set forth above, Plaintiffs Deborah Mahanger and L.M. request that in light of the malicious intent behind their targeting, experimentation, torture and suffering, Defendants Wray, Kable Jr, Mayorkas and Wainstein are held to be jointly liable to them for a reasonable amount in punitive damages estimated at THREE HUNDRED THIRTY-SIX MILLION DOLLARS ($336,000,000).

454.     Plaintiff Mahanger also requests that FBI and DHS be ordered to pay her damages for the illegal disclosure of her inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that it caused her. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

455.     Plaintiffs Mahanger and L.M. request that the court impose on Defendants reasonable attorney's fees and costs under 28 U.S.C. § 2412 and 5 USC § 552(a)(4)(E)(i).

456.     Plaintiff Mahanger further requests that this Court order Defendants to remove her name as well as that of her daughter L. M. from the TSDB and instruct them to abstain from including them in any other illegal database used to carry out human torture, experimentation and/or any other improper purpose.

<u>Lindsay J. Penn</u>

457.     The foregoing allegations are realleged and incorporated herein.

458.     On information and/or belief, in 2014 Plaintiff Penn's name was added to the TSDB.

459.    Plaintiff Penn's nomination was devoid of supporting 'particularized derogatory information' linking her to terrorist activity. Defendant FBI did not give her any notice or opportunity to rebut her nomination.

460.    As a result of Defendants' illegally including Plaintiff Penn as a non-investigative subject under Handling code 3 or 4 in the TSDB since at least 2016, she has sustained substantial damages deriving from the unconstitutional deprivations of her rights protected under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and the Convention Against Torture.

461.    On December 1st, 2014, the day of her son's birthday, Plaintiff Penn  began suffering the effects of VTK. She thought she had developed a mental illness.

462.    However, it wasn't until 2016 that Plaintiff Penn realized she was a TI and the voices she heard twenty-four hours a day were the result of V2K.

463.    As a result of her illicit inclusion in the TSDB, Plaintiff Penn has suffered illegal break-ins to her home, physical and electronic surveillance and organized stalking. Defendants' operatives carry out their stalking/intimidation tactics even when she goes on vacation.

464.    The damages Plaintiff Penn has sustained as a result of Defendants' joint liability stemming from the unconstitutional and illegal organized stalking part of her targeting is estimated in an amount no less than SEVEN MILLION DOLLARS ($7,000,000).

465.    As a result of being targeted since 2014, Plaintiff Penn suffers from intolerable V2K that substantially interferes with every aspect of her life. As a result of the V2K, she has sustained damages amounting to EIGHTY MILLION DOLLARS ($80,000,000)).

466.     The damages Plaintiff Penn has sustained as a result of Defendants' joint liability stemming from the DEW attacks she have suffered since 2016 as a result of her targeting is

estimated in an amount no less than TWENTY-ONE MILLION DOLLARS ($21,000,000).

467.   The constant DEW attacks perpetrated against Plaintiff Penn have caused her a condition known as Havana Syndrome consisting of permanent brain and physical injuries estimated at TWENTY MILLION DOLLARS ($20,000,000) .

468.   Aside from the payment of the damages amounts set forth above, Plaintiff Penn requests that in light of the malicious intent behind their targeting, experimentation, torture and suffering, Defendants Wray, Kable Jr, Mayorkas and Wainstein are held to be jointly liable to her for a reasonable amount in punitive damages estimated at THREE HUNDRED FIFTY-FOUR MILLION DOLLARS ($354,000,000).

469.   Plaintiff Penn also requests that FBI and DHS be ordered to pay her damages for the illegal disclosure of her inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that it caused her. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

470.   Plaintiff Penn requests that the court impose on Defendants reasonable attorney's fees and costs under  28 U.S.C. § 2412 and *Bivens*.

471.   Plaintiff Penn further requests that this Court order Defendants to remove her name from the TSDB and instruct Defendants to abstain from including it in any other illegal database used to carry out human torture and experimentation or any other improper purpose.

<u>Melody Ann Hopson</u>

472.   The foregoing allegations are realleged and incorporated herein.

473.   Around 2014, Plaintiff Melody Hopson began to be followed around her

hometown in Pasadena, Texas.

474.   As a result of Defendants' illegally including Plaintiff Hopson as a non-investigative subject under Handling code 3 or 4 in the TSDB since at least 2014, she has sustained substantial damages to her property and person deriving from the unconstitutional deprivations of her rights protected under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Convention Against Torture.

475.   Plaintiff Melody Hopson became aware in 2016 that she was a TI. She was nominated and included in the TSDB devoid of supporting 'particularized derogatory information', without having being given any notice or opportunity to rebut her nomination.

476.   Defendants FBI's and DHS' reply to Plaintiff Hopson Privacy Act requests provided no information about her inclusion in the TSDB. Specifically, as a result of being targeted,

477.   Plaintiff Hopson has suffered physical and electronic surveillance and organized stalking. As a result of this, she has become socially ostracized, lost friends and became distanced from her family.

478.   In 2016, Plaintiff Hopson started hearing V2K without knowing it was a form of torture. Doctors opined she had schizophrenia. Even though by 2019 the doctors concluded she was not schizophrenic, they have refused to acknowledge the she is the victim of V2K attacks.

479.   Also since 2016 she has been the victim of DEW attacks that cause her burns throughout her body and in particular her feet and genital area.

480.   The damages Plaintiff Hopson has sustained as a result of Defendants' joint liability stemming from the unconstitutional and illegal organized stalking part of her targeting is estimated in an amount no less than NINE MILLION DOLLARS ($9,000,000).

481.    Since 2016, Plaintiff Hopson suffers from intolerable V2K that substantially interferes with every aspect of her life. As a result of the V2K, she has sustained damages amounting to SEVENTY MILLION DOLLARS ($70,000,000)).

482.    The damages Plaintiff Hopson has sustained as a result of Defendants' joint liability stemming from the DEW attacks she have suffered since 2016 as a result of her targeting is estimated in an amount no less than TWENTY-ONE MILLION DOLLARS ($21,000,000).

483.    The constant DEW attacks perpetrated against Plaintiff Hopson have caused her a condition known as Havana Syndrome consisting of permanent brain and physical injuries estimated at TWENTY MILLION DOLLARS ($20,000,000) .

484.    Aside from the payment of the damages amounts set forth above, Plaintiff Hopson requests that in light of the malicious intent behind their targeting, experimentation, torture and suffering, Defendants Wray, Kable Jr, Mayorkas and Wainstein are held to be jointly liable to her for a reasonable amount in punitive damages estimated at ONE HUNDRED TWENTY MILLION DOLLARS ($120,000,000).

485.    Plaintiff Hopson also requests that FBI and DHS be ordered to pay her damages for the illegal disclosure of her inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that it caused her. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

486.    Plaintiff Hopson requests that the court impose on Defendants reasonable attorney's fees and costs under  28 U.S.C. § 2412,  5 USC § 552(a)(4)(E)(i) and *Bivens*.

487.    Plaintiff Hopson further requests that this Court order Defendants to remove her name from the TSDB and instruct them to abstain from including it in any other illegal database used to carry out human torture, experimentation and/or any other improper purpose.

<u>Ana Robertson Miller</u>

488.    The foregoing allegations are realleged and incorporated herein.

489.    Defendant FBI does not have and has never had nor corroborated particularized derogatory information linking Plaintiff Ana Robertson Miller to any act of terrorism. She specifically demands her name be removed from the TSDB.

490.    Plaintiff Ana Robertson Miller became aware in 2016 that she was a TI. Defendant FBI nominated and included her in the TSDB devoid of supporting 'particularized derogatory information'. She was not given any notice or opportunity to rebut her nomination.

491.    Plaintiff Miller has been the victim of organized stalking in public places, motor vehicle noise campaigns such as honking and loud accelerating around her or in front of her house. She has undergone break-ins to her home, physical and electronic surveillance and organized stalking in violation of her rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the Convention Against Torture.

492.    Plaintiff Miller believes her targeting could have begun as early as 2013 as she continuously got rejected from all job she applied for albeit her preparation and experience. She estimates her damages resulting from the organized stalking in SEVEN MILLION DOLLARS ($7,000,000).

493.    In 2019 Plaintiff Miller started having painful, disabling DEW attacks to various parts of her body and sleep deprivation. Prior to the filing of this complaint, her attacks have substantially increased in intensity and duration. She estimates her physical and mental pain and

suffering resulting from the DEW attacks in TWELVE MILLION DOLLARS ($12,000,000).

494.    As a result of Plaintiff Miller's inclusion in the TSDB since at least 2016 and the constant DEW attacks perpetrated against her since then, she has sustained permanent brain injuries and developed a permanent physical condition known as Havana Syndrome. The permanent physical damages and mental pain and suffering this condition causes her are estimated in an amount no less than TWENTY MILLION DOLLARS ($20,000,000).

495.    Aside from the payment of the damages amounts set forth above, Plaintiff Miller requests that in light of the malicious intent behind their targeting, experimentation, torture and suffering, Defendants Wray, Kable Jr, Mayorkas and Wainstein are held to be jointly liable to her for a reasonable amount in punitive damages estimated at ONE HUNDRED SEVENTEEN MILLION DOLLARS ($117,000,000).

496.    Plaintiff Miller also requests that FBI and DHS be ordered to pay her damages for the illegal disclosure of her inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety, depression and loss that it caused her. These damages are estimated in a minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

497.    Plaintiff Miller requests that the court impose on Defendants joint liability for the payment of reasonable attorney's fees and costs under  28 U.S.C. § 2412,  5 USC § 552(a)(4)(E) (i) and *Bivens*.

498.    Ms. Miller specifically requests that this Court order Defendant FBI to remove her name from the TSDB and instruct Defendants to abstain from including it in any other

illegal database used to carry out human torture, experimentation and/or any other illicit purpose.

Devin Fraley

499.    The foregoing allegations are realleged and incorporated herein.

500.    Plaintiff Fraley was nominated and included in the TSDB devoid of supporting 'particularized derogatory information', without having being given any notice or opportunity to rebut her nomination.

501.    Defendant FBI and Defendant DHS replied to Plaintiff Fraley's Privacy Act requests without providing any about her inclusion in the TSDB as she requested.

502.    As a result of Defendant FBI illegally including Plaintiff Fraley as a non-investigative subject under Handling code 3 or 4 in the TSDB since at least 2012, she has sustained substantial damages to her property and person deriving from the unconstitutional deprivation of her rights protected under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Convention against Torture.

503.    Specifically, as a result of being targeted, Plaintiff Fraley has suffered physical and electronic surveillance and organized stalking.

504.    Towards 2016, Plaintiff Fraley's targeting increased in intensity. During that year, she started hearing artificial tinnitus and V2K, torturing her 24 hours a day and severely interfering with her life. As a result of the V2K, she has sustained damages amounting to SEVENTY MILLION DOLLARS ($70,000,000).

505.    Also since 2016 Plaintiff Fraley has been the victim of DEW attacks that cause her burns to her feet, genital area, suffering damages estimated in TWENTY-ONE MILLION DOLLARS ($21,000,000).

89

506.     The damages Plaintiff Fraley has sustained as a result of Defendants' joint liability stemming from the unconstitutional and illegal organized stalking part of her targeting is estimated in an amount no less than ELEVEN MILLION DOLLARS ($11,000,000).

507.     The constant DEW attacks perpetrated against Plaintiff Fraley have caused her symptoms indicative of Havana Syndrome consisting of permanent brain and physical injuries estimated at TWENTY MILLION DOLLARS ($20,000,000) .

508.     Aside from the payment of the damages amounts set forth above, Plaintiff Fraley requests that in light of the malicious intent behind their targeting, experimentation, torture and suffering, Defendants Wray, Kable Jr, Mayorkas and Wainstein are held to be jointly liable to her for a reasonable amount in punitive damages estimated at THREE HUNDRED SIXTY-SIX MILLION DOLLARS ($366,000,000).

509.     Plaintiff Fraley also requests that FBI and DHS be ordered to pay her damages for the illegal disclosure of her inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that it caused her. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

510.     Plaintiff Fraley requests that the court impose on Defendants reasonable attorney's fees and costs under  28 U.S.C. § 2412,  5 USC § 552(a)(4)(E)(i) and *Bivens*.

511.     Plaintiff Fraley further requests that this Court order Defendant FBI to remove her name from the TSDB and instruct Defendants to abstain from including it in any other illegal database used to carry out human torture, experimentation and/or any other improper purpose.

<u>Susan Olsen</u>

512.    The foregoing allegations are realleged and incorporated herein.

513.    Defendant FBI does not have and has never had nor corroborated particularized derogatory information linking Plaintiff Susan Olsen to any act of terrorism. Despite that, her name appears in the TSDB's NIS/Handling Code 3 / 4 lists. She specifically demands her name be removed from the TSDB.

514.    Plaintiff Susan Olsen became aware in 2015 that she was a TI. She was nominated and included in the TSDB devoid of supporting 'particularized derogatory information', without receiving any notice or opportunity to rebut her nomination.

515.    Since at least 2015, Plaintiff Olsen has been the victim of organized stalking in public places, motor vehicle noise campaigns such as honking and loud accelerating around her or in front of her house. She has undergone break-ins to her home, car, bank safety deposit box, interception and theft of postal mail, physical and electronic surveillance and organized stalking in violation of her under the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution and the Convention Against Torture. She has suffered her severe anguish, mental pain and suffering and damages as a direct consequence of Defendants' organized stalking estimated in an amount exceeding EIGHT MILLION DOLLARS ($8,000,000).

516.    In 2016 Plaintiff Olsen started having painful, disabling DEW attacks to various parts of her body that also cause sleep deprivation. Prior to the filing of this complaint, her attacks have substantially increased in intensity and duration. She estimates her physical and mental pain and suffering resulting from the DEW attacks in TWENTY-ONE MILLION DOLLARS ($21,000,000).

517.    As a result of Plaintiff Olsen's inclusion in the TSDB since at least 2016 and the constant DEW attacks perpetrated against her since then, she has sustained permanent brain injuries and symptoms indicative that she has developed the permanent physical condition known as Havana Syndrome. The permanent physical damages and mental pain and suffering this condition causes her are estimated in an amount no less than TWENTY MILLION DOLLARS ($20,000,000).

518.    Aside from the payment of the damages amounts set forth above, Plaintiff Olsen requests that in light of the malicious intent behind their targeting, experimentation, torture and suffering, Defendants Wray, Kable Jr, Mayorkas and Wainstein are held to be jointly liable to her for a reasonable amount in punitive damages estimated at ONE HUNDRED FORTY-SEVEN MILLION DOLLARS ($147,000,000).

519.    Plaintiff Olsen also requests that Defendant FBI and Defendant DHS be ordered to pay her damages for the illegal disclosure of her inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that it caused her. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency and to be calculated when Defendants provide the evidence of the extent of the disclosure.

520.    Plaintiff Olsen requests that the court impose joint liability on Defendants for the payment of the damages alleged herein and reasonable attorney's fees and costs under  28 U.S.C. § 2412 and *Bivens*.

521.    Ms. Olsen specifically requests that this Court order Defendant FBI to remove her name from the TSDB and instruct Defendants to abstain from including it in any other

illegal database used to carry out human torture, experimentation and/or any other illicit purpose.

Jin Kang

522.    The foregoing allegations are realleged and incorporated herein.

523.    Jin Kang, of legal age, United States citizen, single, attorney-at-law, resident of East Brunswick, New Jersey, became aware he was a TI in 2015, but recognizes he may have been a TI for a longer time

524.    Plaintiff Kang was nominated and included in the TSDB devoid of supporting 'particularized derogatory information', without receiving any notice or opportunity to rebut his nomination. Although he believes his targeting began prior to 2015, it didn't become evident until 2015.

525.    As a result of Defendants' illegally including Plaintiff Kang as a non-investigative subject under Handling code 3 or 4 in the TSDB since at least 2015, he has sustained substantial damages to his property and person deriving from the unconstitutional deprivations of his rights protected under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Convention Against Torture.

526.    As a result of being targeted, Plaintiff Kang has suffered physical and electronic surveillance and organized stalking in multiple areas of his life causing him severe anguish, mental pain and suffering and damages exceeding EIGHT MILLION DOLLARS ($8,000,000).

527.    Since Plaintiff Kang was admitted to the New Jersey Bar, the organized stalking attacks have decreased although they have not stopped altogether.

528.    Upon the conclusion of discovery, Plaintiff Kang reserves his right to claim damages resulting from DEW attacks directed at him and the permanent damages they may

have caused him since his name was included in the TSDB since he developed artificial tinnitus, an indicative of satellite tracking and DEW attacks.

529.    Aside from the payment of the damages amounts set forth above, Plaintiff Kang requests that in light of the malicious intent behind his targeting, experimentation, torture and suffering, Defendants Wray, Kable, Mayorkas and Wainstein are held to be jointly liable for the payment of a reasonable amount in punitive damages estimated at TWENTY-FOUR MILLION DOLLARS ($24,000,000).

530.    Plaintiff Kang also requests that the Court hold Defendant FBI and Defendant DHS jointly liable in the payment of his for their  disclosure of his inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that it caused her. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency, to be calculated when Defendants provide the evidence of the extent of the disclosure.

531.    Plaintiff Kang requests that the hold Defendants jointly liable for the reasonable attorney's fees and costs under  28 U.S.C. § 2412 and *Bivens*.

532.     Plaintiff Kang specifically requests that this Court order Defendants to remove his name from the TSDB's NIS/Handling Codes 3 / 4 categories, recall all lists containing his name, and instruct them to abstain from including his name in any other illegal database used to carry out human torture, experimentation and/or any other improper purpose.

<u>Plaintiff Jason Foust</u>

533.    The foregoing allegations are realleged and incorporated herein.

534.    Plaintiff Jason Foust was nominated and included in the TSDB devoid of

supporting 'particularized derogatory information', without ceiving any notice or opportunity to rebut his nomination. Although he believes his targeting began prior to 2015, it didn't become evident until 2016.

535.    Defendant FBI and Defendant DHS replied to his Privacy Act requests refusing to provide any information about his inclusion in the TSDB.

536.    As a result of Defendants' illegally including Plaintiff Foust as a non-investigative subject under Handling code 3 or 4 in the TSDB since at least 2015, he has sustained substantial damages to his property and person deriving from the unconstitutional deprivations of his rights protected under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and the Convention Against Torture.

537.    As a result of being targeted, Plaintiff Foust has suffered physical and electronic surveillance and organized stalking. He gets dangerously stalked and chased while driving his vehicle. The organized stalking that he has sustained as a result of being part of the nefarious experiment has caused him severe anguish, mental pain and suffering and damages exceeding EIGHT MILLION DOLLARS ($8,000,000).

538.    Since 2016, Plaintiff Foust has been the victim of DEW attacks that cause severe tinnitus, burns, bruises throughout his body perpetrating damages estimated in TWENTY-ONE MILLION DOLLARS ($21,000,000).

539.    The constant DEW attacks perpetrated against Plaintiff Foust displays symptoms associate to a condition known as Havana Syndrome consisting of permanent brain and physical injuries estimated at TWENTY MILLION DOLLARS ($20,000,000).

540.    Aside from the payment of the damages amounts set forth above, Plaintiff Foust requests that in light of the malicious intent behind his targeting, experimentation, torture and

suffering, Defendants Wray, Kable Jr, Mayorkas and Wainstein are held to be jointly liable to him for a reasonable amount in punitive damages estimated at ONE HUNDRED FORTY-SEVEN MILLION DOLLARS ($147,000,000).

541.    Plaintiff Foust also requests that the Court hold Defendant FBI and Defendant DHS jointly liable in the payment of his for their disclosure of his inclusion in the TSDB, with the social, professional and personal repercussions, suffering, anxiety and loss that it caused him. These damages are estimated in minimum amount of ONE MILLION DOLLARS ($1,000,000) per year, depending on the quality and quantity of the derogatory information shared outside of the agency, to be calculated when Defendants provide the evidence of the extent of the disclosure.

542.    Plaintiff Foust requests that the hold Defendants jointly liable for the reasonable attorney's fees and costs under   28 U.S.C. § 2412,  5 USC § 552(a)(4)(E)(i) and *Bivens*.

543.     Plaintiff Foust specifically requests that this Court order Defendants to remove his name from the TSDB's NIS/Handling Codes 3 / 4 categories, recall all lists containing his name, and instruct them to abstain from including his name in any other illegal database used to carry out human torture, experimentation and/or any other improper purpose.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court exercise its jurisdiction and issue the following relief:

A.  Issue a Writ of Mandamus to Defendants Wray, Kable Jr., Mayorkas and Wainstein to comply with their ministerial duty to uphold the United States Constitution, and consequently eliminate the NIS/Handling Code 3 / 4 lists from the TSDB and end the human experimentation program that targets individuals;

96

B. Enter Judgment declaring that Defendant DHS, Defendant FBI and inter-agency operation TSC violated the Privacy Act;

C. Enter Judgment declaring that Defendants violated the Administrative Procedure Act, 5 U.S.C. §§ 702, 706;

D. Enter Judgment declaring that Plaintiffs' and TJ Members' inclusion in the TSDB violates their rights protected under the First, Fourth, Fifth, Sixth and Fourteenth Amendments of the Constitution of the United States and ordering their removal from it;

E. Enter Judgment compelling Defendant FBI and the TSC to recall and dismantle the NIS/Handling Code 3 / 4 portion of the TSDB;

F. Enter Judgment declaring repugnant to the United States Constitution the  human experimentation program on Targeted Individuals as it violates the following:

1) The First, Fourth, Fifth, and Sixth Amendments of the Constitution of the United States by punishing its victims for the exercise of Free Speech, conducting illegal search and seizures of their person and things, and depriving them of property and liberty without due process;

2) The Eighth Amendment as it constitutes totalitarian cruel and unusual punishment without the conviction of a crime;

3) The Fourteenth Amendment as the experimentation program disproportionately targets against women and conservatives; and

4) The United Nations' Convention 1753 against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, ratified by the United States of America in 1994.

G. Issue a Permanent Injunction ordering Defendants to:

1) Immediately eliminate Plaintiffs' and TJ Members' names from the TSDB and ban Defendants from including them in any other secret, catalogs, lists, compendium or indexes as described herein to continue the targeting of them;

2) Recall and recover all catalogs, lists, compendiums or indexes disseminated to law enforcement, private companies, individuals and entities that contain Plaintiff's names and personal identifiers;

3) Abstain from devising, perpetrating and enabling the surveillance, organized stalking and psychological torture against Plaintiffs and TJ Members through Defendant DHS' Fusion Centers Network, contractors such as Infragard. Citizen Corps and/or any other person or entity Defendants concoct, collude with or hire for those purposes;

4) Permanently enjoin Defendants from creating another experimentation program or list to include Plaintiffs or TJ Members;

5) Hold Defendants jointly liable for Plaintiffs' damages and order them to pay them the amounts alleged for each one as specified in the paragraphs above incorporated herein;

6) Order Defendants to fund the creation of a Court monitoring system to ensure full compliance with the Court's orders regarding the elimination of any list within the TSDB's that contains individuals who do not meet the "known or suspected terrorist" standard and ensure that no illegal human experimentation program such as the Targeted Individuals program continues or exists in the future.

H. Award damages and attorney's fees and costs pursuant to under 28 U.S.C. § 2412, 5 USC § 552(a)(4)(E)(i) and *Bivens*.

I. Grant such other and further relief as the Court deems just and proper such as the imposition of a monitor to ensure Defendants take the immediate and long-term measures to ensure that they will abstain from their unconstitutional conduct; and

PLAINTIFFS DEMAND TRIAL BY JURY.

Respectfully submitted,

**ANA LUISA TOLEDO**

/s/*Ana Luisa Toledo*
*Southern District of Texas No. 3825092*
*Attorney for Plaintiffs*
*PO Box 15990*
*Houston, TX 77220-1590*
*Tel. 832-247-3046; 340-626-4381*
*analuda@proton.me*

**DATED** *this 12th day of January, 2023.*